

**AUGUSTINI LAW OFFICES**
Alfred E. Augustini       SBN 43204
Nazila Danesh            SBN 209779
alaugie@alaugie.com
nazy@dd-llp.com
515 S. Figueroa St., Ste. 321
Los Angeles, CA 90071
Tel: 213-629-8888
Fax: 213-688-7600

**FINLAYSON, AUGUSTINI & WILLIAMS LLP**
Jeff Augustini           SBN 178358
jaugustini@faw-law.com
110 Newport Center Dr., Ste. 100
Newport Beach, CA 92660
Tel: 949-759-3810
Fax: 949-759-3812

Attorneys for Plaintiffs:
640 SOUTH MAIN STREET PARTNERS, LLC, AND
HSC PROPERTIES, LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| 640 SOUTH MAIN STREET PARTNERS, LLC AND HSC PROPERTIES, LLC, | Case No. 08-cv-3611–DDP-JTL<br>Hon. Dean D. Pregerson, Ctrm: 3 |
| Plaintiffs, | **PLAINTIFFS' AMENDED COMPLAINT** |
| vs. | |
| CITY OF LOS ANGELES, | |
| Defendant. | |
| LA CAN, a non-profit corporation, ALVIN TAYLOR, AND SAVERIO MANISCALCO, individuals. | Action Filed:      May 5, 2008<br>Action Removed:  June 3, 2008<br>Discovery Cutoff: None Set<br>Trial Date:        None Set |
| Counterclaimants, | |
| vs. | |
| 640 SOUTH MAIN STREET PARTNERS, LLC AND HSC PROPERTIES, LLC, | |
| Counterdefendants. | |

- 1 -

PLAINTIFFS' AMENDED COMPLAINT

**PLAINTIFFS' AMENDED COMPLAINT**

1    Pursuant to the Court's Order of October 15, 2008, Plaintiffs, by and through

2    their attorneys of record, submit their Amended Complaint and allege and pray as

3    follows:

### PARTIES

5    1.    Plaintiff 640 South Main Street Partners, LLC is a limited

6    liability company organized and existing under the State of Delaware, with its

7    principal place of business in the City and County of Los Angeles. Plaintiff HSC

8    Properties (Cecil), LLC is a limited liability company organized and existing under

9    the State of Delaware, with its principal place of business in the City and County of

10   Los Angeles.

11   2.    On or about May 24, 2006, Plaintiffs purchased the Cecil Hotel

12   ("Cecil or Hotel") for approximately $28 million. The Cecil is an 80 year old, 15-

13   story hotel with 587 guest rooms in the "Historic Core" ("Core") of Downtown Los

14   Angeles, on South Main St., between 6th and 7th Streets. The Cecil is the 11th

15   largest hotel in Los Angeles.

16   3.    Defendant City of Los Angeles ("City") is and at all material

17   times has been a political and geographical subdivision of the County of Los

18   Angeles and the State of California. The City includes among its many municipal

19   agencies, the Los Angeles Housing Department ("LAHD" or The "Department"),

20   which, among other things, has since 2004 been the lead City agency administering

21   and regulating "Residential Hotels" under several California statutes and City

22   ordinances, which laws are described more fully below.

### FEDERAL JURISDICTION

24   4.    This Court has Federal Question jurisdiction over this action

25   because the federal claims stated herein arise under 42 U.S.C. §1983. Further,

26   pursuant to 28 U.S.C. § 1367(a), this Court has "pendent," "ancillary" and/or

27   "supplemental" jurisdiction over Plaintiffs' remaining claims, which arise under

28   California law, because those state claims "derive from a common nucleus of

**PLAINTIFFS' AMENDED COMPLAINT**

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1   operative fact," and "are so related to [the] claims … within such original

2   jurisdiction" that they form "part of the same case or controversy."

3                              FACTS COMMON TO ALL CLAIMS

4                     **The Cecil is a "Commercial Transient Hotel"**
                      **Located in the City's Recently Re-Vitalized "Core"**

5          5.        Portions of the City's Core, located between Olive and Main

6   Streets until recently, had been in slow decline for decades. In the early 1900's Main

7   Street was at the "core" of Downtown business life, but by the 1970s the business

8   community had moved to the West side of Downtown, and to adjacent urban

9   communities outside the City.

10         6.        East of the "Core" is "Skid Row," an area recently renamed

11  "Central City East." The "Row" is a 50-block squalid district historically inhabited

12  by the downtrodden, most of who live either in public shelters or in one of the 65

13  small, run-down and sometimes dangerous "Single Room Occupancy hotels"

14  ("SROs") located there. "SRO" is slang for a multi-unit building in which people

15  live in single rooms, and share bathrooms. SRO's are sometimes referred to as

16  "flophouses." SROs date back to the late 19th Century, and are typically used by

17  impoverished, mentally ill, drug-addicted, sick and otherwise homeless men

18  needing shelter for an extended term – weeks or months – at the cheapest possible

19  price. As a result, SROs are frequently referred to as "residential hotels" or "SRO

20  residential hotels," and operate essentially as private homeless shelters. These same

21  terms –"SROs" and "residential Hotels" – are also often used to distinguish this

22  "residential" housing from "transient" or "tourist" or "commercial" hotels, which

23  cater primarily to guests staying less than 31 days, unlike SROs and "residential

24  hotels" where stays are primarily longer than 30 days.

25         7.        Notwithstanding the gradual decline of the Core and the

26  worsening conditions in Skid Row, the Cecil has survived as the only large transient

27  hotel remaining on Main Street, continuing to operate a well-staffed and well-

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 3 -

**PLAINTIFFS' AMENDED COMPLAINT**

1   maintained "full-service" hotel, and continuing to attract a substantial majority of its

2   guests from budget travelers and guests needing an inexpensive but clean and safe

3   hotel, rates much lower than the pricey Downtown tourist hotels, and largely free of

4   the problems associated with the Row's SRO "residential hotels."

5          8.     The Cecil owners, who in 2007 sold the Cecil to Plaintiffs,

6   wanted to take advantage of the new business environment on Main Street and

7   expand the Hotel's existing and primarily transient and tourist clienteles. In 2003,

8   they spent almost $4 million improving the Cecil, reduced vacancy rates, and

9   increased room rates, revenues and profits. By the end of 2005, the Cecil was a

10  revitalized commercial, transient hotel with excellent future financial prospects.

11         9.     Meanwhile, the City began investing more money and personnel

12  into Skid Row. It created the LAHD to coordinate the various public agencies

13  operating in the Row and to commence systematic building code enforcement of the

14  decrepit SROs, while beefing up law enforcement to control and regulate the large

15  number of criminals, rampant drug trafficking and the problem of vagrants living on

16  streets in the Row. These efforts, while largely successful, generated a substantial

17  political backlash from various homeless advocacy groups who had a different

18  vision of what was best for Skid Row.

19         10.    The homeless groups opposed the SRO and its resulting

20  "gentrification" and opposed the increased property values. The goal of these

21  groups, which have access to public funds, was instead to keep property values low

22  so they could purchase at least one of the big hotels on Main Street at a large

23  discount, and then convert it into a "super" SRO. As explained by Rebecca

24  Callahan, founder of the publicly funded non-profit Skid Row Housing Trust

25  ("Trust") and one of Downtown's most powerful homeless advocates, the strategy

26  of these advocates was to pressure the City to pass moratoria and other draconian

27  restrictions to roll back the "gentrification" of Main Street, and drive away new loft

28  residents and businesses. With property values plummeting to bargain basement

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 4 -

**PLAINTIFFS' AMENDED COMPLAINT**

1   level, and businesses like the Cecil pushed to bankruptcy, the Trust could acquire

2   the Cecil on the cheap and realize the paramount goal of many advocacy groups:

3   "That's why Main Street is so important … because it has all those huge buildings.

4   … If we could buy one, the Cecil, almost 600 rooms, on 7th and Main, then we

5   would be okay."

### Applicable State and City Statutory Provisions Relating to
### "Residential Hotels" and "Residential Units" in the City

8       11.     Several California statutes and City ordinances and municipal

9   code provisions permit local City agencies, including the LAHD, to regulate

10  "residential hotels" and "residential units," but do ***not*** permit such agencies to

11  regulate commercial or transient hotels. The key distinction recognized by these

12  various intersecting statutes is that commercial and transient hotels, which primarily

13  service "transient" occupants whose stays are relatively brief, are to remain

14  unregulated, while SROs and "residential hotels," which primarily service

15  "residential" occupants whose stays are relatively long, are subject to rent control

16  and other regulations.

17      12.     These intersecting statutory provisions all have a common

18  theme: Transient hotel occupancies *lasting less than* 31 days should be unregulated

19  and subject to "transient occupancy taxes" which generate substantial revenue to

20  California cities; whereas hotel occupancies *lasting more than 30 days* are

21  "residential," are not subject to "transient occupancy taxes," but should be subject to

22  regulation because of the longer stays involved when a guest's "primary residence"

23  is at the hotel.

24      13.     In 1971, the Legislature enacted Revenue & Taxation Code

25  ("R&T") §7280, which authorized cities to levy a "transient occupancy tax"

26  ("TOT") on hotel guests for the "privilege" of "occupying rooms" as a "transient

27  guest." The R&T permits TOT to be levied only on "transients," and excludes from

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

the tax any non-transient, residential occupancy "*for any period more than 30 days.*" The City, like most other cities acting pursuant to R&T §7280, promptly enacted a local ordinance imposing TOT on all guests who occupied any hotel within the City for any stay *less than 31 days*, and exempting any "residential" stay of *more than 30 days.*

14.     At all material times, the vast majority of all Cecil guests – more than 70% – have been "transient" guests whose stays last less than 31 days. Such guests, as required by the City, pay TOT because the City's laws state they are "transient occupants" of the Hotel. Further, the City's Office of Finance regularly audits the Cecil's books to ensure all "transient guests" have paid, and the Hotel has remitted to the City, all TOT due for the "transient occupancy" of these guests. At no time has the City contended the Cecil erroneously collected and paid to the City TOT collected from "residential" guests whose stays lasted longer than 30 days.

15.     Given the State definition of hotel transient occupancy to be a stay of less than 31 days, the resulting "31 Day Rule" embodied in the R&T quickly became the *de facto* legal definition of "transient hotel occupancy" in California and in Los Angeles, and the City agencies adopted administrative guidelines providing that any hotel occupancy lasting more than 30 days was a "residential occupancy," evidencing that the hotel was the occupant's "primary residence," and subject to City regulation. Likewise, under these guidelines, any hotel occupancy lasting less than 31 days was a "transient occupancy," evidencing that the hotel was not the occupant's "primary residence," and thus not subject to regulation.

16.     This well-recognized distinction is codified in California's principal law governing the regulation and protection of "residential hotels:" Health & Safety Code §§50519, *et seq.* ("H&S Act"), the State's statutory framework under which local city and other agencies are permitted to develop "program[s] of financing and loan insurance for the purpose of assisting the rehabilitation and acquisition of residential hotels serving the housing needs of very low and low-

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 6 -

1   income persons." Because the H&S Act was intended to provide regulation and

2   financial assistance only to "residential" SROs which served "primarily" as the

3   "primary residence" for the homeless and other "very low income" persons in areas

4   like Skid Row, the Legislature expressly defined "residential hotels" to *exclude*

5   from regulation and financial assistance those commercial and transient hotels

6   which provided less than 20% of their rooms ("commercial" hotels) or less than a

7   majority of their rooms ("transient" hotel) to poor people.

8        17.   Accordingly, the Legislature carefully crafted the definition of

9   "Residential Hotels" in H&S §50519(b)(1) to exclude "commercial" and "transient"

10  hotels such as the Cecil:

11       "Residential hotel" means any building containing six or more
         guestrooms … *which are occupied, for sleeping purposes … [as] the*
12       *primary residence* of those guests, but *does not mean* any building …
         *primarily used by transient guests* who do not occupy that building as
13       *their primary residence*. [Emphasis added.]

14       18.   The Legislature, to further underscore its intent to prohibit local

15  agencies from using the H&S Act to regulate hotels like the Cecil, which are

16  *primarily occupied* by *transient* guests, expressly stated the term "residential hotel"

17  "*is not intended* to mean *a hotel used primarily by transient guests*" – *i.e.*, guests

18  whose stay does not exceed 30 days [emphasis added]. Thus, the Legislature clearly

19  specified the H&S Act does not include and in fact *excludes* hotels primarily

20  occupied by guests whose stays qualify as "transient occupancy" for TOT purposes.

21       19.   At all material times, all City agencies applying H&S

22  §50519(b)(1), including the LAHD, have agreed the phrase "primarily occupied" in

23  the H&S Act means not less than "50% + 1" of all occupied rooms in the hotel, and

24  that the phrase to "occupy … as their primary residence" means only stays that last

25  for more than 30 days and are not subject to TOT.

26       20.   In 1986, the Legislature, disturbed by California court decisions

27  enforcing local ordinances which prohibited owners of "residential" rental units

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

PLAINTIFFS' AMENDED COMPLAINT

from ceasing to offer such units for rent, enacted the Ellis Act, codified at §§7060 *et seq.* of the Government Code ("Ellis Act"). The purpose of the Ellis Act was to *preempt* local agencies from enacting or enforcing any local ordinance restricting property owners from going out of the residential rental business, from exacting financial or other burdens on owners choosing to go out of the residential rental business, and/or from evicting tenants by withdrawing accommodations from rental housing market. Section 7060(a) of the Ellis Act, as originally enacted in 1981, provided:

> *No public entity … shall*, by statute, ordinance, or regulation, or *by administrative action … compel the owner of any residential real property* to offer, or *to continue to offer, accommodations in the property for rent* or lease. [Emphasis added.]

21.    On January 1, 2004, the Legislature, bowing to political pressure from city officials in San Francisco, Los Angeles and San Diego, enacted an Ellis Act amendment which created a limited "exception" to the original Ellis Act ["Ellis Act Exception"] when a City could *prove* its local regulation applied to "guestrooms within a residential hotel, as defined in Section 50519 of the Health and Safety Code" – *i.e.*, that the hotel was not a "transient" hotel, and that the "residential hotel" met certain additional requirements not pertinent here. Gov't Code §7060(a).

22.    The City cannot meet its burden of proving it is entitled to the benefit of the Ellis Act Exception in this action because the City has failed to present any material evidence that the Cecil is anything other than a "transient hotel" as defined in H&S §50519(b)(1). Accordingly, the Cecil has at all material times been entitled to all the preemptions and other benefits and protections of the original Ellis Act. Further the City and its various agencies, including without limitation the City Council, City Attorney's Office, LAHD, City Building & Safety Department and City Planning Department, have at all material times been prohibited under the Ellis Act from taking any "administrative action" to enforce the City's Interim Control Ordinance No. 177557 ("ICO") or Permanent Control

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 8 -

**PLAINTIFFS' AMENDED COMPLAINT**

1   Ordinance No. 179868 ("PCO") or Amended Permanent Control Ordinance

2   ("APCO") or any other similar successor or amended ordinance subsequently

3   enacted by the City to prevent the Cecil from offering or continuing to offer to rent

4   rooms previously occupied by residential tenants to transient guests, or to prevent

5   the Cecil from "converting" such rooms to transient or commercial use, or

6   demolishing such rooms.

7            23.     In 1979, the City, following enactment of the H&S Act, adopted

8   a Rent Stabilization Ordinance ("RSO") as Chapter XV of the Los Angeles

9   Municipal Code ("Municipal Code"). Pursuant to the RSO, owners of "housing

10   accommodations" under the RSO are subject to various requirements and

11   restrictions, including the registration of "residential units," restrictions on rent

12   adjustments, tenant evictions and proposed renovations, providing 60 days notice of

13   any construction affecting tenants, and submission of an approved "tenant

14   habitability plan," and other requirements.

15            24.     However, these RSO requirements and restrictions apply only to

16   "rental units" defined in Municipal Code §151.02, as:

17          All … guest rooms … and … housing accommodations … in the City …,
         rented or offered for rent for living … *[but] … shall not include: …*
18       *housing accommodations in hotels, … provided that at such time as an*
         *accommodation has been occupied as the primary residence of one or*
19       *more of the same tenants for any period more than 30 days such*
         *accommodation shall become a rental unit subject to the provisions of*
20       *this chapter.* [Emphasis added.]

21            25.     The City definition of "rental units" in §151.02 further provides

22   no "housing accommodation" is a "rental unit" unless it is located in a "residential

23   hotel" as defined in H&S Code §50519(b)(1), and a housing accommodation in a

24   hotel is not deemed to be a "rental unit" subject to the RSO unless "it has been

25   *occupied as the primary residence of one or more of the same tenants for a period*

26   *of more than 30 days* …" [Emphasis added.] Thus, the City's RSO "30 days + 1"

27   "residential occupancy" requirement is identical to the requirements of R&T §7280,

28   CC §§1940(b) and 1940.1 and H&S §50519(b)(1): Namely, any guest occupancy of

- 9 -

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

1  *less than 31 days* is deemed "transient" and unregulated, and any guest occupancy

2  of *more than 30 days* is deemed "residential" and subject to regulation.

3      26.    In 1998, the City amended Housing Regulations in Chapter XVI

4  of the Municipal Code, commencing at §161.301, to place its "Systematic Code

5  Enforcement Program" ("SCEP") under the administration of the LAHD. The

6  amended SCEP required annual code compliance inspections funded by an annual

7  per unit fee charged to each residential property owner, who was permitted to pass

8  that fee on to his/her tenants. SCEP applies to "all residential housing properties

9  with two or more dwelling units on the same lot" but "does *not apply* to residential

10  hotels as defined in H&S §50519(b)(1)." [Emphasis added.] Thus, SCEP only

11  applies to hotels where a majority of the rooms are used by guests staying longer

12  than 30 days, and *not* where a majority of guests stay for 30 days or less.

13      27.    Under SCEP, if a hotel with "residential units" has a majority of

14  its occupied rooms occupied by guests whose stay lasts longer than 30 days, it is

15  deemed a "residential hotel" for purposes of SCEP and the hotel is required to pay

16  annual SCEP fees based on all available rooms in the hotel – even those rooms

17  occupied by "transient" occupants. Conversely, if a hotel with "residential units" is

18  "primarily occupied" by guests whose stay is less than 31 days, then the hotel owes

19  no annual SCEP fees – not even on "residential units" – i.e., rooms rented to an

20  occupant for more than 30 days.

21      28.    The City has a long history of imposing moratoriums and other

22  restrictions designed to prevent the demolition or significant modification of SRO

23  hotels – *i.e.*, hotels offering single-room-occupancy to residents staying for periods

24  of more than 30 days. From 1987 to 1994, the City by ordinance imposed eight

25  separate moratoria on City SROs, and another two moratoria specifically on Skid

26  Row SROs. The City never designated the Cecil as being subject to these moratoria

27  and never threatened to enforce any of these moratoria against the Cecil.

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

29.    In 2003, the LAHD was instructed by the Mayor and City Council to research and report on the status of the City's SRO hotels, but the focus of that inquiry was supposed to center on ensuring the LAHD had an accurate list of all buildings containing "residential units" subject to LAHD administration under the City's RSO and code violation inspection programs.

30.    In about July 2004, the LAHD formed a new Residential Hotel Unit within the Code Enforcement Division with jurisdiction over all "residential units" covered by the RSO and subject to code violation inspection. This new Unit started a comprehensive inspection program of all buildings in the City containing "residential units" which might be "residential hotels" as defined in H&S §50519(b)(1).

31.    This LAHD inspection program, which took two years to complete, was supervised by specially trained professional "inspectors," who applied objective standards specified in the Residential Hotel Unit's written manual, to determine whether a building in the City with some residential units was or was not a residential hotel as defined in H&S §50519(b)(1). The LAHD developed this professional staff and written uniform criteria to ensure the determination process was not affected by political pressure, that all City buildings with residential units would be treated alike, and all determinations would have a rational, objective basis.

32.    In July 2004, the Residential Hotel Unit conducted an initial field survey of the Cecil, confirmed it contained some residential units, and placed the Cecil on a list of potential residential hotels that required a detailed inspection to determine whether the hotel was a residential hotel as defined in H&S §50519(b)(1). In August 2005, the Residential Hotel Unit conducted a detailed inspection of the Cecil, including a physical inspection of 523 out of the Hotel's approximately 600 rooms, inspection of the Hotel's housekeeping report, confirmation that the Hotel provided linen and housekeeping services typical of "transient" or "tourist" hotels, a list of all occupied rooms showing whether the occupant was planning to stay less

**PLAINTIFFS' AMENDED COMPLAINT**

1    that 31 days, and required the owners to provide the Unit with TOT supporting the

2    owners' claim the Hotel was a "transient hotel," and not a "residential hotel."

3              33.    Subsequently, the Unit reviewed all Hotel TOT records audited

4    by the City's Office of Finance as of October 17, 2005 and, based on this objective

5    data, a Senior Inspector in the residential Hotel Unit on that date officially

6    determined the Cecil was a "transient hotel."

7              34.    At about this same date, Councilwoman Perry, the representative

8    for the City District in which the Cecil is located, after reviewing an August 2005

9    LAHD Report on regulation of "residential hotels," sponsored action by the City

10   Council on the then-proposed ICO, and specifically directed the LAHD:

> "to take a <u>full and accurate inventory</u> of all residential and SRO
> Hotels," and <u>to ensure [the LAHD] … has "supporting documents"</u>
> <u>establishing</u> that each building covered by the ICO is in fact a
> "<u>residential hotel.</u>" Further, the motion for the ICO <u>specifically directed</u>
> <u>the LAHD to not include "tourist hotels, such as the Cecil Hotel" under</u>
> <u>the ICO</u>, without clear evidence because of the "impact the ICO
> restrictions would have on [TOT] income the City derives from … such
> hotels." [Emphasis added.]

**In 2006 The LAHD's Rent Unit "Targeted" The Cecil For
Different Treatment Under the ICO Than The Treatment Given
All Other Transient Hotels By Determining The Cecil Was A
Residential Hotel Subject To The ICO Without Any Rational
Basis, And In Violation of The-Existing LACD Written
Standards, Even Though The Agency's Own Residential Hotel
Unit Comprised of Professional Inspectors, Had Determined In
October 2005 The Cecil Was A "Transient" and Not A
"Residential" Hotel**

15            35.    The admonitions in Councilwoman Perry's October 2005

21   Council motion were a clear warning to the LAHD not to arbitrarily or without

22   objective supporting data designate the Cecil as a residential hotel subject to the

23   about-to-be-enacted ICO. Councilwoman Perry's remarks immediately attracted the

24   attention and fierce opposition of homeless advocates who knew the H&S Act

25   defined "residential hotel" to expressly exclude "transient" and "tourist" hotels, so

26   such advocates interpreted Perry's statement as a directive to the LAHD to exclude

27   the Cecil should the ICO because it was a "transient" and not "residential" hotel.

28

**AUGUSTINI LAW OFFICES**
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

36.     These advocacy groups, including LAF/LA and LA CAN, realized they would be unable to pressure the professional inspectors in the Residential Hotel Unit to bend their Unit's established objective standards, so instead they began pressuring senior LAHD officials in the LAHD "Rental" Unit to reverse the Residential Hotel Unit's October 2005 determination the Cecil was a transient hotel and thus would ***not*** be subject to the soon-to-be enacted ICO.

37.     The LAHD Rental Unit supervisory officials had no training as to the relevant evidence and standards required to determine the status of transient hotels, and instead were political appointees who agreed with the goal of the advocacy groups, which was to "capture" the Cecil's 600 room Hotel to house homeless people, and reverse the tide of "gentrification" on Main Street, thereby extending Skid Row West into Main Street.

38.     On information and belief, these advocacy groups urged senior Rental Unit officials to ignore the October 2005 determination made by the Residential Hotel Unit that the Cecil was a transient hotel, to ignore all the objective TOT data and room record data which showed "transient" guests comprised more than 70% of the Cecil's total occupancy, and instead to designate the Cecil as a "residential hotel" under the ICO – based simply on the word of homeless activists in the "community," who subjectively believed public policy should force the Cecil to become a residential hotel for homeless people, even though there was no objective data or rational basis to support such a determination.

39.     In April 2006, as a result of the pressure from advocacy groups and her own personal conviction the LAHD should force the Cecil to become a residential hotel serving the homeless instead of transient guests, Mirta Ocana ("Ocana") of the Rental Unit, acting in concert with LAF/LA and LA CAN, started her own "investigation" of the Cecil. The purpose of that alleged "investigation" was to produce some pretext on which the Rental Unit could reverse the Residential Hotel Unit's October 2005 determination that the Cecil was a transient hotel, by

- 13 -

**PLAINTIFFS' AMENDED COMPLAINT**

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1    making a new determination the Cecil was a residential hotel, and thus subject to the

2    soon-to-be-enacted ICO, even if that pretext had no basis in fact.

3           40.     Shortly after the commencement of the Ocana "investigation,"

4    the City on May 10, 2006 enacted the ICO, which became effective on May 24,

5    2006 for a period of one year, but which term was later extended such that the ICO

6    did not expire until May 24, 2008 – after this lawsuit was initiated. The ICO

7    prohibited all "residential hotels" from, among other things, "converting" "one or

8    more existing guest rooms" "to other different residential use," including use as a

9    "commercial" hotel or "from a residential to a transient … use or occupancy;"

10   prohibited from taking "any action that reduces the number of existing guest

11   rooms," including "combining two or more existing guest rooms to make a larger

12   unit;" and were also required to pay higher SCEP fees.

13          41.     At about the time the ICO became effective, the Ocana

14   "investigation" was using LA CAN personnel to collect signatures from occupants

15   of the Cecil on pre-printed form declarations prepared by LA CAN, in which the

16   signatory stated under penalty of perjury the room the person occupied at the Cecil,

17   and the duration of the persons' purported stay. Each form included a pre-printed

18   statement that the Cecil was the person's "primary residence". The LAHD files hold

19   43 of these forms, about 60% of which were signed by persons who had occupied

20   the Cecil for less than 31 days at the time the signature was obtained.

21          42.     In addition, on June 6, 2006, Ocana, accompanied by an attorney

22   for LAF/LA and the Director of LA CAN, as well as numerous other LA CAN

23   personnel, personally visited the Cecil "to find out just how many of the Cecil's

24   guest are permanent residents." On June 9, 2006, Ocana filed a report with the

25   LAHD in which she identified *six* Cecil rooms in which she met Cecil occupants

26   sympathetic to LA CAN, and who told Ocana, in substance, that everyone in the

27   "homeless community" "knew" the Cecil was a residential hotel.

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

43.     On information and belief, Ocana, after her June inspection of the Cecil with representatives of LAF/LA and LA CAN, believed she had found a pretext for claiming – namely, hearsay and unsubstantiated statements from a small number of Cecil residents and from homeless advocacy groups – that the Cecil was a residential hotel since most of the Cecil guests were not "tourists." But Ocana realized the information she was relying on was not the kind of objective evidence needed to *prove* the Cecil was a residential hotel if the Cecil filed a legal challenge.

44.     Accordingly, Ocana, working with LAF/LA and LA CAN, came up with a plan to force the Cecil to claim it was a transient hotel and exempt from SCEP, so that LAHD could arbitrarily reject the exemption claim, and then take the position the Hotel, by default, was a residential hotel subject to the ICO. Pursuant to this plan, directed James Hildebrant, who was also with the LAHD Rent Unit, and the LAHD Assistant Director of Rent Stabilization, to send a July 6, 2006 demand letter to the Cecil characterizing the Cecil's then-recent payment of annual SCEP fees – which covered the only 150 "residential" rooms out of the almost 600 total rooms in the Hotel – as a "claim of partial exemption."

45.     The reason the Rent Unit sent the Cecil this July 'exemption" notice was that Ocana believed the notice would put the Cecil in a double bind: If the Cecil simply registered more than 50% of its rooms as "residential" for SCEP purposes, the LAHD would contend the Cecil admitted it was a residential hotel because more than more than 50% of its occupants were "residential." On the other hand, if the Cecil in fact sought the SCEP "exemption" by claiming the Cecil was a transient hotel, the Rent Unit, under the control of Ocana, could arbitrarily decide the Cecil had failed to prove the exemption claim, thereby justifying the Rent Unit in classifying the Cecil as a residential hotel – without the LAHD ever having to produce any objective evidence justifying that designation.

46.     Of course, the Cecil had never claimed any such SCEP exemption; it merely had registered 150 rooms, which registration had already been

- 15 -

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1  formally approved by the LAHD Rent Unit. Nevertheless, the July 6th LAHD letter

2  stated:

> SCEP does not allow for the partial exemption of buildings. If you have
> claimed a partial exemption from SCEP and we find the reference
> property is a residential hotel, all units at property will be subject to
> SCEP inspection and we will bill you for the outstanding balance. If we
> find that the reference property is not a residential hotel, none of the units
> will be subject to SCEP inspection and you would be eligible for a refund
> of any 2006 SCEP fees already paid.

7  47.    The July 6th LAHD letter demanded a response within 30 days:

8  Either the Cecil must pay SCEP fees for all rooms or provide LAHD with evidence

9  supporting the alleged (and non existent) exemption claim. The letter also stated that

10  if the Cecil failed to meet that deadline, "LAHD will consider all [Cecil] … units to

11  be subject to both SCEP and Rent Registration …."

12  48.    On July 24, 2006, the Cecil's attorneys delivered the Cecil's

13  written response to the LAHD July 6th "exemption" letter, noting the Cecil is not a

14  "residential hotel" under H&S §50519 and attaching voluminous "hard"

15  documentary evidence, including room usage data, TOT data showing that during

16  preceding 3-year period "approximately two-thirds of the hotel's total revenues have

17  been generated by transient guests," and other Cecil records showing all "transient"

18  guests had paid TOT taxes. Of course, the TOT records specified whether guests

19  occupied the Hotel as "transients," *i.e.*, for less than 31 days, so the TOT records

20  provided compelling evidence that most of the Cecil's guests were "transient" and

21  not "residential."

22  49.    On July 24, 2006, immediately after the Cecil's "exemption"

23  response was delivered to LAHD, Ocana sent a team of LAHD auditors to the Cecil

24  to inspect and audit all current Cecil TOT records. But the LAHD auditors found

25  nothing wrong with the Cecil's TOT records, and concluded the TOT records

26  clearly demonstrated the Cecil was a transient and not a residential hotel. The

27  resulting LAHD TOT audit report concluded the Cecil TOT records clearly showed

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 16 -

**PLAINTIFFS' AMENDED COMPLAINT**

the Cecil was a transient hotel, with transient guests outnumbering residential guests by a ratio of almost 4-to-1.

50.     Ocana immediately suggested, without any basis for doing so, that the Cecil had manipulated its TOT numbers to hide its "true" residential hotel status, but the LAHD auditors apparently lacked sufficient skill and experience to discover the Cecil's fraud. So Ocana requested the City's Office of Finance, which audits all TOT records submitted all hotels in the City, to review the LAHD audit report and then conduct a 3-year detailed audit of the Cecil's books to determine whether its TOT records were in fact accurate.

51.     In response to the Ocana's request, the City Office of Finance sent two Senior Tax Auditors to conduct two concurrent but independent audits of the Cecil TOT records for the period from 1/1/03 through 6/30/06. The Office of Finance audit lasted several days and was completed on August 8, 2006. At the end of the audit, the City auditors found "the Hotel should be considered a transient Hotel since the majority of monthly receipts tested were transient versus tenant" and "indicated that 468 rooms out of 615 – or 76% tested, were determined to be transient rooms."

52.     Ocana did not believe the results of this second report either, and caused an email to be sent to the Office of Finance auditors, requesting they confirm whether their audit had found any discrepancies or mis-reported TOT taxes to artificially increase the number of rooms on which TOT was paid. But the City auditors responded by email, assuring the LAHD they had carefully tested the Cecil's room occupancy and payment data and the Cecil TOT data and found no evidence the Cecil's TOT data did not accurately reflect the true level of transient occupancy at the Cecil.

53.     Meanwhile the Cecil's attorneys – having supplied the LAHD on July 24th with voluminous data demanded in the LAHD July 6th "exemption" letter, and knowing the Cecil had endured the June 6th Ocana inspection and two audits of

- 17 -

**PLAINTIFFS' AMENDED COMPLAINT**

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1    the Cecil's TOT records, became concerned they had heard nothing back from the

2    LAHD. Accordingly, the Cecil's owners and their counsel placed numerous calls to

3    LAHD senior personnel in an effort to determine its response to the July 24th

4    package, the June 6th inspection, and the July and August 2006 audits. However,

5    the LAHD only advised it was still investigating the matter, and referred counsel to

6    a member of the City Attorney's office, who in mid-August, 2006 advised the City

7    believed the Cecil was a "residential hotel," but the only source of that belief was

8    "input from guests and others in the community." Counsel for the Cecil requested

9    this information, but the LAHD and City Attorney's Office refused to provide it.

10             54.    Ocana realized her "SCEP exemption" gambit and the results of

11   the Office of Finance's audit created a massive problem for the Rent Unit's plan to

12   use the "exemption" gambit to justify a determination that the Cecil was a

13   residential and not transient hotel. The Cecil had not agreed to pay SCEP fees on

14   more than 50% of its rooms, and the records submitted by the Cecil, together with

15   the results of the LAHD and Office of Finance audits, had created a mass of

16   objective evidence demonstrating the Cecil was in fact a transient hotel.

17             55.    Ocana and other senior LAHD Rent Unit officials met with

18   various advocacy groups to obtain advice as to what to do, and decided to undertake

19   a survey of Cecil during which Rent Unit personnel along with homeless advocacy

20   group personnel would collectively question Hotel occupants using "leading

21   questions" designed to induce them to provide "anecdotal" responses that the

22   LAHD could later use to suggest the Cecil was not a "tourist" hotel. Such questions

23   included whether the guest was a "tourist" or a "businessman," whether the Hotel

24   met the guest's expectations as a "tourist hotel," and other similar questions.

25   Roberto Aldape ("Aldape"), with the help of homeless advocacy groups, prepared a

26   written 4-page "script" for use by LAHD officials conducting the survey at the

27   Cecil.

28

**AUGUSTINI LAW OFFICES**
ATTORNEYS AT LAW

- 18 -

**PLAINTIFFS' AMENDED COMPLAINT**

56.     On November 8, 2006, a 20-person LAHD team conducted an on-site survey of all Cecil tenants in their respective rooms. As with Ocana's June 6th inspection, this survey generated many guest complaints that the survey team had harassed them, and tried to get them to say they were "residents" and to provide false complaints against the Hotel. On information and belief, the LAHD's official written report on the results of November 8th survey, like the June 6th inspection, failed to provide any objective evidence that the Cecil was not a "transient" hotel.

57.     On information and belief, in late 2006 senior managers of the LAHD, consisting of Ocana, Mercedes Marquez  ("Marquez") and Aldape, conferred as to how to respond to the Cecil's repeated demands for information pertaining to the "residential hotel" issue, given that the Residential Hotel Unit, based on hard, objective data, and following established LAHD guidelines for determining residential hotel status, had determined in October 2005 that the Cecil was a *transient* hotel. Indeed, the Ocana "investigation," by requiring both the LAHD and the Office of Finance to audit all TOT and business records of the Cecil, actually confirmed that all objective data demonstrated the Cecil was a *transient* hotel – with almost 80% of Cecil occupants being transient  guests – and leaving the LAHD with no rational basis for claiming the Cecil was a residential hotel.

58.     But these LAHD officials remained committed to subjecting the Cecil to the ICO as a residential hotel, and in or about late December 2006 the same LAHD managers decided to employ the second half of the "exemption gambit," by advising the Cecil that it had failed to prove it was an exempt transient hotel under SCEP,  and therefore was a "residential hotel." This approach permitted the LAHD to reach the result it wanted without having to offer any objective evidence  that the Cecil was a residential hotel, and further permitted the LAHD to avoid disclosing that the sole reason it rejected the Cecil "exemption" claim was that LAHD Rent Unit officials had deliberately targeted the Cecil to be subject to the ICO without

**AUGUSTINI LAW OFFICES**
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

1   any rational or objective basis for doing so, and solely to permit activist groups to

2   capture the Cecil as a hotel for the homeless.

3         59.    Accordingly, Aldape, on January 8, 2007 wrote a brief 3-

4   paragraph letter to the Cecil attorneys as the LAHD response to the Cecil attorneys'

5   July 24, 2006 "request for a Department determination regarding the present status

6   of the Cecil Hotel." This letter merely stated: "<u>As you know</u> the Cecil has been and

7   continues to be on the Department's list of 'residential hotels' <u>established several</u>

8   <u>years ago</u>." [Emphasis added.]

9         60.    In fact, the earlier LAHD "residential hotel" lists were merely

10  lists of *potential* residential hotels that needed to be investigated, and the only prior

11  determination the LAHD had made concerning the Cecil's status was the

12  determination following the Residential Hotel Unit's Fall 2005 investigation –

13  namely, that all objective data obtained in the investigation required a determination

14  the Cecil was a transient hotel, and was not and never had been a residential hotel.

15        61.    But Mr. Aldape's January 8, 2006 letter deliberately omitted any

16  reference to the October 2005 LAHD investigation and its determination that the

17  Cecil was a transient hotel, or to the Rental Unit's arbitrary decision, without any

18  rational basis, to deliberately and intentionally treat the Cecil differently from all

19  other transient hotels in the City solely because the LAHD managers, at the request

20  of the homeless community, wanted to convert the Cecil from a successful transient

21  hotel to a residential hotel for the exclusive use of the homeless.

22        62.    On or about January 28, 2007, and based on the determination

23  made by Ocana, Marquez and Aldape, and Aldape's January 8, letter to the Cecil,

24  The LAHD made a formal determination the Cecil was a residential hotel subject to

25  the ICO, and that formal determination was recorded in a LAHD computer database

26  to memorialize the formal and final determination of the LAHD. On or about that

27  same date, the LAHD sent written notice of its "determination" – that the Cecil was

28  a residential hotel as defined in the ICO and subject to all restrictions specified in

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

the ICO – to the Department of Planning ("DOP") and the Building & Safety Dept. ("B&S") – *i.e.,* it notified those departments that the LAHD had made its final determination.

63.     Concurrently with the enactment of the ICO, the LAHD, DOP and B&S had set up a "ZIMAS" computerized zoning database and DOP had established "Zoning Information Files" to interface with the ZIMAS database. Once the LAHD communicated that it had determined a particular parcel of City property to be subject to a particular City land use ordinance, that parcel was "flagged" as being subject to the ordinance in the ZIMAS database, and DOP would prepare a "Zoning Information File" ("ZIF") which was linked to the ZIMAS database and direct B&S what to do if the parcel owner submitted a permit application.

64.     Accordingly, whenever the LAHD sends DOB and B&S written notice of its decision that a given hotel has been formally and officially determined to be a residential hotel, the enforcement of that decision and determination by all City agencies becomes automatic. The legal requirements for that hotel to comply with the ICO would pop up in ZIMAS, and the linked ZIF file. In the case of the Cecil, the ZIMAS database noted the Cecil was subject to the ICO, and the linked ZIP stated: "the Los Angeles Housing Department has made the determination that the subject property is a Residential Hotel, pursuant to [H&S Code §50519]." And the ZIF file further expressly directed B&S and all other City agencies as follows:

> Do Not Clear any permit to convert or demolish units in a Residential Hotel until the Los Angeles Housing Department has approved an Application for Clearance for the permit pursuant to the Residential Hotel Unit Conversion and Demolition Ordinance. [Emphasis in original.]

65.     Under this ZIMAS/ZIF system, once the LAHD sent written notice of its formal determination there is no way for the Cecil to apply for a permit request to obtain a denial of the permit, or seek a variance from either the denial or from the ordinance. The ZIP file directs B&S (for example) that, if the Cecil files a permit request subject to the ICO, B&S can take *no action* on that permit unless and

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 21 -

1   until the LAHD first approves a written "clearance" of the ICO restrictions. Since

2   the ZIF file requires the given agency to *withhold* approval of such clearance, the

3   permit application will simply remain frozen – without ever being denied.

4        66.    Thus, when the LAHD arbitrarily and without any rational basis

5   sent written notice to DOP and B&S that the LAHD had officially determined the

6   Cecil was subject to the ICO, and that information was entered into the ZIMAS and

7   ZIF databases, there was no way the Cecil could compel B&S or any other

8   applicable City agency to grant or deny a permit to enable the Cecil to seek a

9   variance or file a lawsuit for the denial of a permit. The Cecil's only legal recourse

10  would be to challenge the LAHD's wrongful designation of the Cecil as a

11  residential hotel.

12  **Efforts By Professional Inspectors In LAHD's Own Residential**
**Hotel Unit and Plaintiffs To Change The LAHD's Arbitrary**
13  **January 2007 Residential Hotel Determination Are Unsuccessful**
**Because The LAHD Repeatedly Insists Its January 2007**
14  **Determination Is Final And Nothing Short Of A Court Order**
**Can Or Will Change It**

15       67.    On May 2, 2007 Aldape, following up on his January 8th notice

16  the LAHD had officially determined the Cecil was a residential hotel, sent the Cecil

17  written notice that the Cecil, because it had been officially determined to be a

18  residential hotel, had become obligated to pay annual SCEP fees on all of its rooms.

19  And that same letter demanded the Cecil immediately pay all additional SCEP fees

20  specified in the letter. This letter, like Aldape's earlier January 8th letter, falsely

21  stated: "As you are aware, LAHD has long considered the Cecil Hotel to be a

22  residential hotel." This letter also falsely stated that the earlier January 8th LAHD

23  determination that the Cecil was a residential hotel "was made through a

24  combination of an examination of your operating records and site visits to the

25  property."

26       68.    On May 24, 2007, the Plaintiffs, without any knowledge of the

27  events described above, closed on their $28 million purchase of the Cecil. Plaintiffs

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 22 -

acquired the Hotel with the reasonable investment expectation that, after spending several million more dollars for Hotel upgrades and improvements, the Cecil could and would expand its "transient hotel" business to include Fashion District businessmen, guests of nearby loft residents, middle-class sports fans attending Staples Center and union and other middle-class conventioneers visiting the LA Convention Center – all of whom are plausible candidates for the Cecil's "European-Style" comfortable but relatively inexpensive accommodations close to these popular locations.

69.     Under Plaintiffs' business plan, the Cecil, with renovations, upgrades and improvements, would greatly increase transient occupancy and profits, thereby increasing the projected market value of the Hotel to not less than $60 million. This projection was validated by the fact that in late 2007 – before Plaintiffs had even begun their planned improvements – Plaintiffs had received at least one informal purchase proposal for the Hotel in excess of $40 million.

70.     On June 11, 2007, shortly after the Plaintiffs acquired the Hotel, the LAHD re-invoiced the Cecil for additional 2007 SCEP fees allegedly owing, and which were originally the subject of Aldape's May 2, 2007 letter. After an exchange of correspondence and a meeting between Aldape and the Hotel operator, Aldape, on August 3, 2007, sent a letter to the Cecil demanding immediate payment of the requested additional SCEP fees and threatening, in the event payment in full was not made within 30 days, the commencement by the City of litigation to recover all fees, plus interest and substantial penalties.

71.     The Cecil objected, noting that the LAHD billings for additional 2007 SCEP fees assumed the Hotel was a "residential hotel," but Plaintiffs knew the Hotel TOT and room occupancy records clearly showed a majority of the Hotel's occupants were "transient guests," not residential guests, so Plaintiffs wanted the Department to provide support for its position. Aldape, however, persisted in claiming the additional SCEP fees were owing. On October 4, 2007, the LAHD,

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

after further correspondence had failed to resolve the dispute, sent the Hotel a "Final Notification" that if it failed to "immediately" pay the disputed SCEP fees in full, the LAHD would commence legal action to collect the fees, interest and penalties. In a final effort to resolve the impasse, a meeting was scheduled for late December among LAHD officials, the City Attorney's office and Plaintiffs.

72.     However, before that December meeting occurred, a major dispute erupted within the LAHD concerning its January 2007 official determination that the Cecil was a residential hotel subject to the ICO. On October 23, 2007, Barbara Schultz ("Schultz"), an attorney for LAF/LA, read an L.A. Downtown News article in which a Cecil manager, in a press interview, described the major renovations Plaintiffs' would soon commence at the Cecil. Schultz, who had participated in the 2006 Ocana "investigation" of the Cecil, sent Daniel Gomez ("Gomez"), the Supervisor of the LAHD Residential Hotel Unit, an email (with a copy to Ocana) asking how the proposed substantial renovations planned for the Cecil could be commenced – because she understood the LAHD had made its final determination the Cecil was a residential hotel subject to the ICO, so the Cecil should be blocked from processing any construction permits (because the LAHD would simply refuse to approve an "Application for Clearance"). And she further noted that the LAHD should be insisting the Cecil, as a residential hotel, provide 60-days notice to all Hotel occupants of all renovation plans as well as filing a "tenant habitability plan" under the RSO.

73.     Gomez, although the Supervisor of the LAHD Residential Hotel Unit, was surprised to learn some other Unit of the LAHD had made a formal determination the Cecil was a residential hotel - because Gomez knew his Unit in 2005 had made an extensive investigation of the Cecil and had determined, based on voluminous evidence, that the Cecil was a transient hotel, and was not a residential hotel. Accordingly, Gomez reviewed all LAHD records pertaining to investigations of the Cecil, and found records as to the Fall 2005 inspection conducted by the

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

Residential Hotel Unit and the Ocana 2006 "investigation." Gomez summarized those records in an October 23, 2007 Memo to his superior, Mr. Sauceda, entitled: "Is The Cecil Hotel … A Residential Hotel Subject To The [ICO]." That memo states in pertinent part as follows:

*Our [2005] hotel investigation section* had inspected the Cecil Hotel, reviewed business [TOT] tax records, *and determined that the Cecil Hotel is not a "residential hotel" because the main use of the building is by "transient guests" who do not use the building as their primary residence.* [Quotation of H&S §50519 omitted]

*As a transient hotel, the Cecil Hotel would not be within the scope of the [ICO] so a tenant habitability plan would not be required.* However, on Friday I learned that some months ago Ms. Mirta Ocana had led a group of people through the Cecil Hotel, interviewed guests, and made their own determination that the Cecil is a residential hotel. As a result, my staff in the hotel inspection section continues to keep the Cecil Hotel on their residential hotel inventory list even though they found that the use of the Cecil Hotel does not meet the legal definition of a residential hotel.

This is problematical because *my understanding is that determinations relating to the use of land and buildings are a technical determination that only employees in the classifications of inspectors, engineers, planners, and zoning administrators may make.*

*In addition, I have not seen any information from Ms. Ocana's group to substantiate a finding that the Cecil Hotel is a residential hotel.* I should also mention that the LAHD billing section database shows [a] … May 21, 2007 … entry *that states that on January 28, 2007, the department had determined that the Cecil Hotel is a residential hotel.* …

*For the record, I agree with my staff's finding that the Cecil Hotel is not a residential hotel* and given the renovation plans expressed by the owner, there may be certain risks to the City associated with a finding that the Cecil Hotel is a residential hotel.

[Emphasis added except underlined words in original.][1]

74.     After distribution of the Gomez October 23rd memo, Aldape called a meeting of all Inspectors who worked on the 2005 Cecil Hotel inspection and determination, and Ocana. The purpose of the meeting was to see if the 2006 Ocana investigation and resulting January 2007 Rent Unit determination that the

---

[1] This October 23, 2007 memo, and the November 5, 2007 memo described below, were produced by Mr. Gomez at his November 12th deposition (taken by Plaintiffs) from his *personal* files.

**PLAINTIFFS' AMENDED COMPLAINT**

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1    Cecil was a residential hotel could be reconciled with the 2005 Residential Hotel

2    Unit investigation and determination that the Cecil was a transient hotel.

3         75.    In preparation for that all-hands meeting, Gomez, at the request

4    of Mr. Sauceda, prepared another Memo, this one dated November 5th, providing a

5    detailed chronology of the 2005 and 2006 inspections of the Cecil. This Gomez

6    Memo contrasts the voluminous records supporting the 2005 transient hotel

7    determination with the lack of any evidentiary support in LAHD files for the 2006

8    Ocana investigation and January 2007 residential hotel determination. According to

9    this Gomez memo, the principal basis for the January 2007 residential hotel

10   determination is a June 9, 2007. Ocana memo about an inspection that Ocana, Ms.

11   Schultz and the Director of LA CAN made of the Cecil on June 6th, in which Ocana

12   believed the Hotel "guests did not look like tourist[s]," and instead were "dressed

13   like residents of the area when this hotel is located, and in which a handful (6) of

14   Hotel tenants, apparently LA CAN "clients," said they agreed with her observation

15   that "there were no tourists in the hotel."

16        76.    The gist of the November 5, 2007 Gomez memo is that he, as the

17   Supervisor of the rental Unit, found the October 2005 Residential Hotel Unit

18   inspection to be extensive, detailed and well-supported by substantial

19   documentation, whereas the June 2006 Ocana investigation was superficial,

20   unsupported by any objective evidence, and was based primarily on unsubstantiated

21   subjective anecdotal impressions of Ocana and six LA CAN members as to how

22   many "tourists" seemed to be using the Hotel.

23        77.    On November 7, 2007 Aldape held the "all hands" meeting to

24   discuss the two Gomez memos and the obvious discrepancy between the 2005 and

25   2006 investigations and determinations. Aldape began the meeting by observing that

26   he was concerned about possible litigation between the LAHD and the Cecil over

27   the SCEP fee dispute. He also was concerned the Cecil would discover the 2005

28   inspection which determined the Cecil was a transient hotel.

**AUGUSTINI LAW OFFICES**
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

78.     Aldape then closely questioned the 2005 inspection team about the details of their inspection and their unanimous conclusion there was overwhelming evidence the Cecil was not a residential hotel, but the 2006 investigation was done by people having no experience or training in hotel inspections, did not follow established LAHD guidelines or customary practices, was very superficial, and there was no objective evidence support, or rational basis for, the January 2007 determination the Cecil was a residential hotel. In fact, the LAHD record control system reflected that Ocana had checked out the data files relating her 2006 investigation, and those files were now missing.

79.     Aldape asked the Inspectors if they believed the October 2005 transient hotel determination was valid, and they all agreed they had great confidence in that determination and believed it was correct. Aldape then uttered an oath and stated if there was litigation with the Cecil over the "residential hotel" determination, the LAHD would be "f***ed" because the court would surely enter "judgment" for the Cecil.

80.     According to Gomez' sworn deposition testimony, the LAHD Inspectors all agreed there was no rational basis for the January 2007 residential hotel determination, that determination did not follow establish LAHD procedures and practices as set forth in the then-existing LAHD manual for hotel inspections, the determination ignored all objective evidence showing the Hotel was 80% occupied by transients, and the January 2007 residential hotel determination resulted from the Rental Unit targeting the Cecil for special treatment to ensure it would be designated a residential hotel. Gomez testified the Cecil was the only hotel among several hundred hotels on the LAHD's potential residential hotel list that had been subjected to the treatment given by Ocana and the Rent Unit personnel.

81.     After the November 7, 2007 all hands meeting, Aldape met with Ocana and Marquez and decided that, even though the LAHD January 2007 "residential hotel" determination was virtually unsupported by any substantial

**PLAINTIFFS' AMENDED COMPLAINT**

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1    evidence, was arbitrary, had violated accepted procedure and practices, and treated

2    the Cecil differently from all other transient hotels by "targeting" the Cecil unfairly

3    in order to convert the Cecil to a residential hotel for the homeless, they would stick

4    with their arbitrary determination as the LAHD's final decision on the Cecil.

5              82.    Also, according to Gomez, these LAHD officials, in order to

6    intimidate the Residential Unit Inspectors so they wouldn't make their October 2005

7    transient hotel determination or their criticisms of the January 2007 residential hotel

8    determination public, summarily removed Gomez as Supervisor of the Residential

9    Hotel Unit, demoted him, and relocated him to a satellite LAHD office, and then

10   they stripped the Residential Hotel of any authority to make future "residential

11   hotel" determinations.

12             83.    Shortly thereafter, on December 20, 2007, Aldape and other

13   senior LAHD officials met with representatives of the Cecil owners, who had

14   requested the meeting because they wanted to know why the LAHD had officially

15   determined the Cecil was not a tourist hotel. Of course, Aldape did not disclose (a)

16   what had happened at the all-hands LAHD meeting just a month before, (b) the

17   arbitrary and unfair nature of the LAHD January 2007 determination, (c) the

18   October 2005 determination the Cecil was in fact a transient hotel, (d) that the

19   January 2007 determination failed to apply the standards used for other transient

20   hotels to the Cecil, (e) that the professional inspectors at the LAHD unanimously

21   believed the January 2007 determination was unfair and unsupported, arbitrary,

22   without any rational basis and obviously incorrect, or (f) that the January 2007

23   determination was made to satisfy homeless advocate groups who wanted to convert

24   the Cecil from a transient hotel into a hotel for the homeless.

25             84.    Instead, Aldape told the Plaintiffs' representatives the LAHD

26   would not discuss the reasons it had determined the Hotel to be a "residential hotel,"

27   or the evidence that determination was based on. He stated the decision had been

28   made, acknowledged Plaintiffs' efforts to obtain a reconsideration of the decision,

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 28 -

PLAINTIFFS' AMENDED COMPLAINT

but advise Plaintiffs the January 2007 determination was final and would not be changed under any circumstance. Aldape suggested Plaintiffs accept the decision, and make a "deal" with the LAHD to use the Hotel for affordable housing and sheltering the homeless. Aldape said that in the meantime the LAHD would enforce the ICO against the Cecil and freeze any permits submitted to renovate the Hotel.

85.     Plaintiffs expressed complete surprise and shock the LAHD could, would and was taking such an outrageous position. Plaintiffs explained the reason they wanted the meeting was not to make any "deal," but rather to find out what legal and factual basis the City had for believing the Cecil was a "residential hotel." Plaintiffs stated the Hotel operator had recently told them the LAHD had never provided any explanation as to why the Department believed the Hotel was a residential hotel, and they came to find out why the Department rejected the Hotel's TOT records showing the Cecil was primarily a transient hotel.

86.     Plaintiffs indicated they might consider cooperating if the LAHD would provide some reasonable factual and legal basis for its January 2007 determination. Aldape then agreed to provide copies of sufficient LAHD records to give Plaintiffs an understanding as to why and how the Department determined in January 2007 that the Cecil was a residential hotel subject to the ICO.

87.     In mid-January, the LAHD delivered to Plaintiffs a small packet of assorted documents allegedly explaining the basis for the January 2007 determination. However, the packet included nothing showing any factual basis for the LAHD determination, nor any explanation as to what legal interpretation was used by the LAHD to bring the Hotel within the legal requirements stated in H&S §50519(b)(1).

88.     Frustrated and perplexed, the Cecil retained new counsel to request that the LAHD reconsider its January 2007 determination that the Cecil was a residential hotel. But those efforts resulted in the City Attorney's Office advising Plaintiffs that the LAHD would not provide any further information to the Cecil,

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1   that the LAHD was comfortable with their residential hotel determination, and that

2   the determination was final and was not subject to change. Indeed, the City

3   Attorney's Office advised Plaintiffs their only options at that point were to accept

4   the LAHD determination or sue the City to overturn the determination, because only

5   a Court order would change the January 2007 determination.

### Actions Taken By The LAHD And Other City Agencies
### To Enforce The ICO And Successor Ordinances To Prevent
### Plaintiffs' Attempted Renovations To The Cecil

9        89.      The ICO expired in May 2008 and was replaced by the PCO,

10  which imposed the same draconian restrictions as those in the ICO. Immediately

11  upon the PCO becoming effective, the LAHD sent written notice to the DOP and

12  B&S that, based on the LAHD's January 2007 determination, the Cecil had been

13  officially determined to be a residential hotel subject to all PCO restrictions. Again,

14  as with the ICO, this official determination was logged into the ZIMAS/ZIF system,

15  requiring all City agencies to not process any Cecil applications to renovate the

16  Hotel without first receiving "clearance" approval from the LAHD.

17       90.      The City filed a motion to dismiss Plaintiffs' original complaint

18  in this action, contending Plaintiffs' §1983 claims were not 'ripe.' After Plaintiffs

19  filed their opposition to that motion, the City realized the PCO, like the ICO, on its

20  face violated Due Process under the Federal Constitution because it, among other

21  things, failed to provide the Cecil and other designated hotels constitutionally

22  adequate pre- or post-determination notice and/or hearing rights, as alleged by

23  Plaintiffs.

24       91.      In an effort to disguise the fatal defects in the PCO, the City

25  subsequently proposed and on August 13th enacted the APCO, which has since

26  become effective. However, the changes enacted by the City in the APCO fail to

27  adequately address and cure the myriad of facial Constitutional defects in both the

28  ICO and PCO.

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

92.      Immediately upon the APCO becoming effective, the LAHD again sent written notice to the DOP and B&S that, based on the LAHD's January 2007 determination, the Cecil had been officially determined to be a residential hotel subject to all APCO restrictions. Again, as with the ICO and PCO, this official determination was logged into the ZIMAS/ZIF system, requiring all City agencies to not process any Cecil applications to renovate the Hotel without first receiving "clearance" approval from the LAHD.

93.      During the pendency of the ICO, PCO and APCO, the LAHD's official determinations that the Cecil is a residential hotel have been the logged into the ZIMAS/ZIF system, and that system has effectively prevented the Cecil from making planned renovations and needed repairs, and further has prevented the Cecil form obtaining new sources of revenue – all because the LAHD wrongfully designated the Cecil as a residential hotel and recorded that determination in the ZIMAS/ZIP system.

94.      Most importantly, Plaintiffs have been required to abandon their entire business plan for the Hotel, which was based on substantial renovations to create a "Best Western" type facility in a portion of the Hotel. Plaintiff were forced to abandon such plans because, under the ZIMAS/ZIF system, even if Plaintiffs incurred the substantial time and expense needed to submit detailed construction plans for the renovations to B&S, the ZIF linked file for the Cecil – under all three ordinances – specifically directs BOS to withhold the processing of all such plans unless and until the LAHD approves "clearance" of the plans under the particular ordinance. And the LAHD has repeatedly advised the Cecil it will not approve any clearances for any renovations to the Hotel. Accordingly, submission of such permits would be a useless act:  B&S will neither grant nor deny any submitted permits, and absent the denial of a permit, there is no process available to obtain meaningful judicial review or to seek a variance.

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

95.     In addition, Plaintiffs have attempted to make routine plumbing and other repairs for which no permit is required under City laws, and sought to take other actions that have been blocked – solely because, under the subject ordinances, the Cecil has been determined to be a residential hotel. For example:

A.     The Cecil attempted to repair and move various sinks and plumbing in various rooms – repairs that required no permits. However, tenant advocates complained to City agencies that this work was part of a alleged plan to "convert" the Hotel, so stop orders were issued preventing the work from continuing – solely because the ZIMAS/ZIP system showed the LAHD had determined the Cecil to be a residential hotel;

B.     The Cecil has attempted on two occasions to repair damaged ceiling soffitts (projects that require no permits) at various locations in the Hotel. Again, tenant advocates complained to City agencies that these projects were part of a alleged plan to "convert" the Hotel, so stop orders were again issued preventing the work from continuing – solely because the ZIMAS/ZIP system shows that the LAHD determined the Cecil to be a residential hotel;

C.     Plaintiffs have attempted to undertake various minor repairs throughout the Hotel, but, tenant advocates have complained to City agencies these routine repairs were also part of an alleged plan to "convert" the Hotel. In these instances, the repairs have been blocked or rendered uneconomical because City agencies have ordered work stopped unless and until the Cecil first gives 60 days notice to all occupants and files a tenant habitability plan for each repair – again, solely because the ZIMAS/ZIP system shows that the LAHD determined the Cecil to be a residential hotel;

D.     Plaintiffs have attempted to convert a former laundry area off the Lobby into a restaurant and bar, but such work requires that the Cecil obtain a liquor license and the City police refused to approve a liquor license because it is standard Police policy to oppose liquor licenses in "residential hotels." Accordingly,

- 32 -

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1   all work on the planned restaurant/bar has stopped – solely because the ZIMAS/ZIP

2   system shows the LAHD had determined the Cecil to be a residential hotel; and

3                           E.       To generate additional operating income, the Cecil has

4   contracted with movie location managers to use the Hotel in various movie scenes.

5   The Cecil is much in demand for these "shoots," but, again, the City police have

6   refused to grant a license for such movie shoots because it is Police policy to oppose

7   such shoots in residential hotels.

8              96.     Because the City has wrongfully applied the draconian

9   restrictions of the various ordinances on the Cecil, and because of the other

10  restrictions imposed by other City agencies solely as a result of the LAHD's

11  recorded determination in the ZIMAS/ZIF system that the Cecil is a residential hotel

12  , Plaintiffs have been unable to commence or complete not only their planned Hotel

13  improvements, but also routine repairs, all of which are needed to increase Hotel

14  occupancy to the levels projected by Plaintiffs' business plan and to generate the

15  profits needed to carry the debt load resulting from Plaintiffs' purchase. As a result,

16  the Hotel is running substantial negative monthly cash flows. Further, as a result of

17  their inability to renovate the hotel, Plaintiffs have lost additional revenues, and

18  have incurred additional losses, in an amount to be proven at trial, but in no event

19  less than $10 million.

20          **The City's May 20, 2008 "Permanent Control Ordinance"**
             **Violates the Ellis Act and Plaintiffs' Federal and State Due**
21          **Process and Equal Protection Rights, As Does The City's**
             **Recently Enacted APCO.**
22

23             97.     As noted above, the ICO expired on or about May 20, 2008 and

24  the City, in order to extend its moratorium on "conversions" of "residential hotels,"

25  adopted the PCO to extend and modify the ICO prohibitions, and to make the new

26  restrictions permanent. On or about March 19, 2008, the first publicly available

27  draft of the City's proposed PCO was published as "Exhibit A" to a lengthy LAHD

28  report explaining the history, purpose and intent of the PCO. The public release of

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 33 -

**PLAINTIFFS' AMENDED COMPLAINT**

the draft PCO was the first notice Plaintiffs had that the LAHD and City Attorney's Office had been drafting a permanent ordinance embodying provisions even more onerous than those contained in the ICO. With the proposed PCO, Plaintiffs understood why the LAHD had not provided information concerning its determinations under the ICO: The City was stalling the Cecil while it prepared the new PCO. One of the attachments to the PCO was an "official" list of hotels – this one containing more than 300 City buildings – which the LAHD had determined to be "residential hotels" as defined in H&S §50519(b)(1) and thus subject to the ICO and PCO. The Cecil is on that list. On or about April 15, 2008, the City made available to the public another report to which was attached a revised draft of the proposed PCO and a copy of the LAHD's residential hotel list containing the Cecil.

          98.     On May 20, 2008, shortly after this action was filed, the PCO, as enacted by the City on May 6th, became effective. Like the ICO, the PCO adopts the "residential hotel" definition in H&S §50519(b)(1).

**Plaintiffs Have No Duty Under 42 U.S.C. §1983 To Exhaust Remedies Provided In The ICO, PCO And/Or APCO Before Prosecuting This Action, And In Any Event Pursuing Such Defective Remedies Would Be Futile, And Are Thus Excused.**

          99.     The City has advised Plaintiffs it will ask the Court to deny Plaintiffs any relief on their 42 U.S.C. §1983 claims herein unless and until Plaintiffs first fully exhausted the constitutionally defective administrative remedies contained in the PCO, and APCO. However, exhaustion of such defective remedies is not required under §1983, and in any event has been excused and/or would be futile on each and all of the following grounds:

          A.     The ICO contained no remedies and no procedural provisions for notice or the right to be heard, and therefore, there were no ICO remedies to be exhausted;

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B.      As of the date Complaint was filed, the purported remedies set forth in the PCO and APCO were unavailable to Plaintiffs because the proposed PCO and later APCO had not yet been enacted or become law;

C.      Plaintiffs are not required to exhaust any available state or local remedy before seeking and obtaining relief pursuant to Plaintiffs' constitutional tort claims asserted herein under 42 U.S.C. §1983;

D.      Plaintiffs are not legally required to exhaust administrative remedies where facial challenges are asserted to ordinances or where the legal/constitutional challenge attacks the legality and adequacy of the administrative procedures themselves;

E.      Exhaustion is not required because the City here has already made its determination, and the end result of any administrative appellate process is a foregone conclusion, and thus requiring Plaintiffs to exhaust such processes would be futile; and

F.      For the reasons more specifically set forth in Plaintiffs' causes of action herein, the remedy procedures set forth in the PCO and APCO are inadequate and futile because they "presume" the Cecil is a residential hotel under H&S §50519(b)(1), and nowhere require the City to prove that fact before applying the PCO and APCO to the Cecil, thereby denying the Plaintiffs the right to confront and challenge the "presumption," and functionally impose on Plaintiffs the burden of proving the Cecil is a "transient" hotel.

100.    In addition, it would be unconscionable to require Plaintiffs to exhaust the inadequate procedures and/or purported remedies under the PCO and APCO because the sheer length of that process, taking perhaps more than a year, would cause irreparable injury to Plaintiffs by subjecting them to the foreclosure of the purchase money mortgage on the Hotel.  Constitutional injury is irreparable injury under the law.

1    101.    As more fully described herein, the City's wrongful enforcement

2    of the above-mentioned ordinances against the Cecil since Plaintiffs acquired the

3    Hotel in May 2007, has resulted in substantial monetary damages to Plaintiffs.

4    Under the "appellate" procedures of the PCO and APCO, the City theoretically

5    could delay final disposition of the "appellate" process for a minimum of nine

6    months, with the power to further extend them many months through the City's

7    administrative control over the process.

8    102.    The wrongful conduct of the City to date with respect to the

9    improper and unlawful designation of the Cecil as a "residential hotel," the City's

10    concealment of evidence in support of Cecil's status as a "transient hotel," together

11    with the inadequate and unconstitutional remedies set forth in the PCO, is positive

12    proof that any further proceedings before the LAHD are predetermined to result in

13    an adverse ruling for Plaintiffs.

14    **FIRST CAUSE OF ACTION**

15    **[42 U.S.C. §1983**

16    **VIOLATIONS OF THE UNITED STATES CONSTITUTION]**

17    103.    Plaintiffs hereby incorporate the allegations of paragraphs 1-89,

18    inclusive, and realleges the same as if fully set forth herein.

19    104.    The City, under the color of state law and through a series of

20    official ordinances, regulations procedures, policies, acts and customs, improperly

21    and intentionally has deprived Plaintiffs of their constitutionally due process and

22    equal protection rights in violation of the Fourteenth Amendment of the United

23    States Constitution. Further, the City has acted with deliberate indifference to

24    Plaintiffs' rights through the employment of regulations, procedures, policies, acts,

25    procedures, customs and practices designed to be, and that were, so obviously

26    inadequate to protect Plaintiffs' constitutional rights, and were so likely to result in

27    violation of those rights, that its failure to provide additional or alternative policies,

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

1    procedures and safeguards amounted to deliberate indifference to the need to protect

2    Plaintiffs' constitutional rights.

3         105.   Specifically, in depriving Plaintiffs of their constitutional rights

4    without due process and in violation of equal protection, the City has acted pursuant

5    to officially sanctioned ordinances, regulations, procedures, policy, customs and

6    practices, and specifically the official actions of the Los Angeles City Council, the

7    LAHD, and the City Attorneys' Office in preparing, enacting, and implementing the

8    ICO, PCO and APCO, preparing and implementing all rules, regulations,

9    procedures, policies and practices necessary to make effective, implement and

10   enforce the ICO, PCO and APCO, and/or in administering those ordinances or

11   adjudicating individual cases thereunder. The constitutional violations arising from

12   such actions form the basis of this cause of action.

### Facial Due Process Violations Under the ICO

13

14        106.   Although the ICO expired on or about May 20, 2008, Plaintiffs'

15   §1983 claims were not rendered moot by such expiration because Plaintiffs have

16   asserted substantial damage claims based on the City's wrongful application and

17   enforcement of the ICO against the Cecil. These City actions regarding the ICO

18   were wrongful because, among other reasons, the ICO "facially" deprived Plaintiffs

19   of their procedural due process rights under the Fourteenth Amendment when the

20   City enacted the ICO, which *on its face* failed to provide *any* constitutionally

21   adequate pre- *or* post-determination procedural due process of law.

22        107.   Specifically, the ICO *on its face* failed to provide for *any* pre-

23   determination notice of the facts supporting the LAHD's coverage determination,

24   failed to provide any pre-determination opportunity for affected hotel owners such

25   as Plaintiffs to meaningfully challenge its determination or to "make their case" as

26   to why they should not be subjected to the ICO, and failed to provide any

27   meaningful way for owners, *after* obtaining the facts upon which the LAHD

28   intended to rely but *before* the determination was made, to be heard and/or to

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 37 -

1    provide a meaningful response thereto – thereby depriving owners such as Plaintiffs

2    from providing the constitutionally required "meaningful hedge" against erroneous

3    action.

4         108.    The City also committed multiple "facial" procedural due process

5    violations when it failed to provide in the ICO constitutionally mandated post-

6    deprivation notice and hearing rights to affected hotel owners. Specifically, no

7    provisions or procedures were provided in the ICO itself giving affected property

8    owners such as Plaintiffs a meaningful opportunity, *after* receiving notice and being

9    fully informed of the bases for the LAHD's determination, to meaningfully address

10   or challenge the LAHD's determination and/or the purported bases therefore via a

11   fair and impartial post-determination tribunal. Indeed, no such notice or hearing is

12   provided.

13        109.    In its prior Motion to Dismiss, the City admitted that the *only*

14   mechanism provided was set forth in Section 8 of the ICO, and permitted affected

15   owners, *post-determination*, to request a "hardship" exemption from the City

16   Council – an exemption that did not in any way relate to, or allow affected owners

17   to challenge, the constitutionality or and/or the legal/ factual sufficiency of the

18   LAHD's determination – and thus utterly failed to provide the constitutionally

19   required due process to Plaintiffs and other affected owners.

20        110.    Given the substantial nature of Plaintiffs' constitutionally

21   protected property rights and the nature and seriousness of the deprivation of those

22   property rights occasioned by the ICO restrictions, the Cecil and its owners

23   constitutionally were entitled to pre-deprivation notice of the LAHD's intended

24   residential hotel determination, to pre-determination disclosure of all facts and

25   evidence upon which the LAHD's determination was to be based, and a meaningful

26   pre-determination opportunity to prepare for and to provide a substantive response

27   and to challenge that determination and the alleged facts and evidence supporting it

28   at a pre-determination hearing, and again at a constitutionally adequate post-

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

1    determination hearing. The City's failure to provide the required pre-and post-

2    deprivation due process constitutes material *facial* violations of Plaintiffs'

3    procedural due process rights under the Fourteenth Amendment – violations that

4    Plaintiffs legally are entitled to pursue and for which they may seek redress

5    (including monetary damages) under 42 U.S.C. §1983, and for which it may also

6    obtain injunctive and declaratory relief (as alleged below), and which render the

7    ICO *void ab initio*. *Harris v. County of Riverside*, 904 F.2d 497, 505 (9th Cir. 1990).

8                    *"As Applied" Due Process Violations Under the ICO*

9         111.    The ICO as enacted not only was facially unconstitutional, but it

10   also was unconstitutional as it was "applied" to the Cecil by the LAHD.

11        112.    Despite the fact that it admittedly spent eight months (or longer)

12   preparing the ICO and investigating which hotels might properly fall under its

13   purview, the LAHD made its residential hotel determination under the ICO yet at no

14   time prior to making its determination did the LAHD notify the Cecil of its intended

15   determination, provide the Cecil or its owners with a recitation of the facts or other

16   grounds purportedly supporting its determination, and at no point prior to making its

17   determination did the LAHD provide the Cecil or its owners with a meaningful

18   opportunity to oppose its intended determination or to challenge the factual or legal

19   bases (if any) therefore.

20        113.    Indeed, the City has admitted that it provided no such pre-

21   determination due process to the Cecil or its owners, either under the provisions of

22   the ICO themselves or under or pursuant to any rules, regulations, policies, customs

23   and/or practices employed by the LAHD and/or other agencies in implementing or

24   administering the ICO as enacted. Because due process violations are deemed

25   complete and actionable under §1983 the moment the City failed to provide the

26   required due process, and because the lack of pre- and post-determination due

27   process gives rise to separate and independently actionable constitutional violations,

28   even assuming post-determination process had been provided, that process could not

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 39 -

1    and cannot cure or be used as a substitute for providing the required *pre-*

2    *determination* due process.

3           114.    As noted above, Plaintiffs were not given, and to this day *still*

4    have not been given, constitutionally adequate notice of the bases (if any) for the

5    LAHD's determination that the Cecil was and is a residential hotel subject to the

6    ICO. Similarly, the City (via the LAHD) has failed to provide Plaintiffs with any

7    meaningful opportunity to prepare for, or to engage in, a fair and impartial *post-*

8    *deprivation* hearing to challenge the constitutionality of the ICO and/or the

9    purported factual/legal bases for the LAHD's ICO coverage determination; nor is

10   there any provision for such a hearing under the ICO regime or any of the rules,

11   regulations, policies, procedures, practices or customs of the City, and more

12   particularly that LAHD. By failing to provide for any post-deprivation due process

13   in connection with the ICO, the City has further and separately violated Plaintiffs'

14   procedural due process rights.

15          115.    The City's failure to provide any meaningful pre- or post-

16   determination due process, either in the ICO itself or in the rules, regulations,

17   policies, procedures, customs and/or practices employed by the LAHD in

18   implementing and administering the ICO, was purposeful and was specifically

19   designed to prevent affected hotel owners the LAHD had targeted for coverage

20   under the ICO, such as Plaintiffs, from meaningfully opposing or challenging the

21   legality and/or factual sufficiency of its determinations. The City's intent is evident

22   from the "new" (albeit still constitutionally infirm) post-deprivation procedures in

23   the PCO and APCO, which merely highlight that the City was well aware of need to

24   provide procedural protections to affected hotels deemed to be covered by the ICO,

25   but simply opted not to provide any such protections.

26                  ***Facial Procedural Due Process Violations Under the PCO***

27          116.    The PCO was enacted in early May 2008, and became effective

28   on May 20, 2008. The subsequent enactment of the APCO does not render

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

1  Plaintiffs' §1983 PCO claims moot because Plaintiffs have asserted substantial

2  damage claims based on the City's wrongful application and enforcement of the

3  PCO against the Cecil. Those City actions regarding the PCO were wrongful

4  because, among other reasons, the PCO, like the ICO before it, is unconstitutional

5  on its face because it fails to provide Plaintiffs with *any* pre-determination due

6  process as constitutionally required. The City placed the Cecil on the "LAHD

7  Residential Hotel Inventory" list, showing the LAHD had made the determination

8  that the Cecil Hotel would be a residential hotel subject to the PCO as soon as it was

9  enacted – or more accurately, that the LAHD determined to extend its prior

10 determination regarding the Cecil under the ICO to the PCO on the day the PCO

11 became effective. This intention is reinforced by the "Findings" contained in the

12 PCO, wherein the City Council "found" that "[t]he Los Angeles Housing

13 Department (LAHD) currently designates 336 hotels [including the Cecil Hotel] as

14 residential hotels, which contain 18,739 units in the City of Los Angeles"). *See* PCO

15 at §47.72(c).

16          117.    The very day the PCO went into effect, the LAHD updated the

17 City's "ZIMAS" database profile on the Cecil Hotel – a profile which describes the

18 past and present zoning status of the property, including all ordinances (such as the

19 ICO and PCO) to which the property is subject – to confirm that it had "made the

20 determination that the subject property is a Residential Hotel," and even attached a

21 copy of the PCO to the Cecil's ZIMAS file along with formal "instructions" to other

22 City agencies that no permits should be issued to the Cecil unless and until "an

23 Application for Clearance" of the permits is first "approved by" the LAHD pursuant

24 to the requirements of the PCO.

25          118.    Amazingly, the City Council, in enacting the PCO, again failed to

26 provide *any pre-determination notice and hearing provisions* in the ordinance itself.

27 The PCO provides a post-determination appellate process, but that process is triggered

28 by the LAHD's written notification to Plaintiffs that the LAHD has "classifie[d] [their

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

1   hotel] as a residential hotel *that is subject to this Ordinance*." Stated differently, the

2   PCO's post-determination provisions are triggered by the delivery of the LAHD's

3   letter notifying affected hotel owners that the City *already has determined* their

4   properties are "residential hotel[s] subject to this ordinance."

5          119.    Notwithstanding the fact that the LAHD had more than *two*

6   *years* following the passage of the ICO to conduct its factual investigation and to

7   compile any and all facts and evidence purportedly supporting its residential hotel

8   determinations and to provide affected hotel owners with meaningful notice and an

9   opportunity to respond to the charges and supporting evidence, the City

10  conspicuously again failed in the PCO to provide affected hotel owners, including

11  Plaintiffs, with *any* pre-determination notice or hearing to address or challenge the

12  constitutionality, validity, factual sufficiency or applicability of the LAHD's

13  determination, in violation of Constitutional due process requirements. Indeed, the

14  City admittedly applied the PCO to the Cecil, and by doing so has prohibited it from

15  obtaining or even processing *any* renovation, demolition or conversion permits – yet

16  *to this day, the City (i.e., the LAHD) has not yet provided **any notice*** to the Cecil

17  that it was even been "brought under the PCO," let alone provided meaningful

18  notice of the facts/law upon which its determination purportedly was based.

19         120.    Unlike pre-determination procedures – which are non-existent –

20  the PCO does purport to provide a multi-step post-determination "appellate"

21  process. However, that post-determination process also is facially defective in, *inter*

22  *alia*, the following ways:

23         A.    It charges the LAHD, the same agency responsible making

24  the residential hotel determination, with administering the PCO appeals process and

25  with making the ultimate factual and legal review of the propriety of that

26  determination – this despite the fact that the LAHD certainly is not an impartial and

27  disinterested decision maker capable of objectively reviewing its own

28  determinations, and indeed Plaintiffs have alleged that the determination itself was

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 42 -

made in conscious disregard of the findings of the LAHD's Residential Hotel Unit, the City's Office of Finance, and audited TOT data approved by the City.

        B.      The LAHD is not required in either the written notice of determination described in PCO Section 47.75(b) or in any of the appeals provisions of Section 47.75(C) or 47.83 to disclose or explain to affected hotel owners the factual or legal bases (if any) supporting its own residential hotel determination, and indeed nowhere in the PCO is the LAHD *ever* legally required to provide affected owners with the even the most basic type of information found to be constitutionally required in the *pre-determination* setting.

        C.      The PCO provisions relating to the First Appeal require hotel owners to prove by a preponderance that their properties are *not* residential hotels by setting forth the basis of their argument and all supporting evidence, even though the LAHD is not required first to disclose to the owners the basis of its original determination – thereby leaving the owners "in the dark" as to what facts, evidence and information they must address in the appeal, and effectively insulating the LAHD's determination from any meaningful challenge. *Id.*

        D.      The PCO provisions relating to the First Appeal permit tenants and other unspecified "interested parties" to also submit evidence to the LAHD even though such information was *not* used or relied upon initially by the LAHD to make or support its determination. Further, the provisions allow third parties to submit such evidence directly to the LAHD *after* the owner has submitted its appeal documents to the LAHD – yet *does not require* that tenants and other third parties provide such evidence to owners or permit the owners to object to or respond to such third party evidence. *See* PCO, §47.75(c). Thus, the PCO forces an appealing owner to "lay all of his cards out" despite receiving no information whatsoever regarding the basis for the LAHD's determination, and then, after its appeal is submitted, permits third parties to secretly submit evidence the owners do not even see, let alone have a chance to respond to or rebut.

- 43 -

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

E.      The PCO provisions relating to the First Appeal mandate that the LAHD's written ruling on the owner's appeal "shall" be based *solely and exclusively* on the evidence submitted" by the owner and other third parties – *i.e.*, it is **not at all based on any of the facts or information purportedly supporting the LAHD's original determination**, but rather is expressly limited to *ex post facto* evidence provided by the owner and *other non-LAHD* persons and organizations. Thus, the "appeal" in fact is not an "appeal" at all, since the owner has no pre-submission information about the bases for the LAHD's original determination, and thus has no way to confront or challenge those bases (if any) in its appeal documents, and the LAHD's written decision on the first appeal expressly *excludes* consideration of the LAHD's own facts and evidence (which are not submitted if at all until the Second Appeal). Thus, this first appeal is specifically structured to allow the LAHD to ignore altogether the bases for its determination, and permits it to uphold its initial determination by rejecting the sufficiency of the owners' evidence and/or by relying on "new" evidence submitted *long after the fact* by third parties. *Id.*, §47.75(C). Stated differently, the appeal process itself is designed to fully immunize the LAHD from mistaken, erroneous, and/or arbitrary and capricious administrative action.

F.      The PCO procedures relating to the First Appeal do not provide for or permit a "hearing" of any kind, in violation of clear constitutional requirements. *Id.*, §47.75(C);

G.      In an improper effort to shield the LAHD's determination from substantive attack, the PCO not only impermissibly shifts the burden to Plaintiffs to prove their "appeal" by "a preponderance of the evidence" – thereby relieving the LAHD of its own legal obligation to factually justify its determination – but also requires appellant owners to affirmatively *disprove* the self-serving and legally impermissible "presumption" contained in the PCO that each of their rooms was a residential unit as of the arbitrary date of October 11, 2005 – this without the LAHD ever having to present its own evidence or demonstrate the reasonableness of

- 44 -

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1     the presumption. PCO, §§ 47.73, 47.75(b), (c).

2             H.      By requiring appellant owners in the First Appeal to prove

3 the residential and/or tourist status of all of their units as of October 11, 2005, even

4 though the City provided no notice until approximately March 2008 (via the first

5 publicly available draft of the PCO) that the *only* relevant date for purposes of the

6 LAHD's PCO determination would be the status of each of their rooms on October

7 11, 2005 (nearly two and a half years earlier) – and further despite the fact that

8 owners under no circumstances are legally required to prove the status of *each and*

9 *every one* of their rooms for purposes of the residential hotel test under H&S

10 §50519(b)(1). *Compare id.*, §§ 47.75(C), 47.73(T), *with* H&S 50519(b).

11             I.      By requiring appellant owners in the First Appeal to

12 affirmatively prove the resident/transient status of each hotel room in its property,

13 even though the LAHD itself is not required to possess, let alone present or provide,

14 *any* evidence demonstrating the status (resident/transient) of any such rooms as of

15 that date. Stated differently, the PCO provisions themselves reveal that the appellate

16 process is a sham, because it is not actually "appealing" any determination, but

17 rather, under the guise of an "appeal," permits the LAHD to designate any hotel as a

18 residential hotel unless and until the owner affirmatively *disproves* by a

19 preponderance of evidence the status of each of its rooms as of the arbitrary date of

20 October 11, 2005 – and if the hotel fails to meet that burden, it is *by definition*

21 irrevocably "presumed" to be a residential hotel subject to the PCO, even if it does

22 not meet the H&S definition of a residential hotel.

23             J.      By purporting to shift the burden to hotel owners to prove

24 the *inapplicability* of the "exception" to the Ellis Act prohibitions set forth in

25 Government Code Section 7060(a) through a transparent and legally improper re-

26 charactering the Ellis Act exception as an "exemption." *See* Cal. Gov. Code §7060(a)

27 (residential hotel "exception" to applicability of Ellis Act prohibitions), *see also*

28 *Green v. State of California*, 42 Cal. 4th 254, 269 (2007) (ordinarily, "[o]ne who

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

1    claims the benefit of an exception from the prohibition of a statute has the burden of

2    proving that his claim comes within the exception").

3              K.    The PCO provisions relating to the Second Appeal

4    expressly permit both *tenants and third parties* to appeal from the LAHD's initial

5    appeal determination – i.e., it gives *third parties* appeal rights and permits them to go

6    out and "get" more evidence if the evidence they submitted in the first round is

7    deemed insufficient. Then, if needed to tip the scales, the PCO permits "LAHD

8    staff," as well as owners, tenants and any other "interest third parties" to present a

9    broad array of further "evidence" at the General Manager's Hearing, including

10   evidence *not previously disclosed or provided* by those third parties ***or by the***

11   ***LAHD***.

12             L.    The PCO provisions relating to the Second Appeal permit

13   but do not require the LAHD to disclose, explain or present the "evidence" upon

14   which its determination was based, and includes no provisions giving owners the

15   right to such disclosure from the LAHD; nor do the PCO provisions require the

16   LAHD or other third parties to disclose to the owners in advance of the hearing the

17   evidence they plan to disclose or prevent – thereby precluding the owners from

18   having any meaningful opportunity to prepare a response to such evidence, even

19   though the third parties and LAHD under the provisions of the PCO would be

20   entitled to see *all* of the owner's evidence *at least* 30 days prior to the hearing. *See*

21   PCO, §47.83(C)-(F).

22             M.    The PCO provisions relating to the Second Appeal are also

23   deficient because they expressly provide that the Second Appeal's sole purpose is to

24   review only the LAHD's written determination from the first appeal for error or

25   abuse of discretion, thereby again further insulating the LAHD's original

26   determination from any meaningful or substantive *factual* challenge. *Id.*, §47.83(F).

27   In short, it appears that the sole purpose of the General Manager's appeal process is

28   to provide LAHD and its homeless advocate allies up to 8 months (if not longer) and

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 46 -

**PLAINTIFFS' AMENDED COMPLAINT**

1    multiple opportunities to "jam" the administrative record with a myriad self-serving,

2    conclusory and/or legally inadmissible evidence rebutting the hotel owner's fully

3    disclosed evidence, so as to further complicate Plaintiffs' ability to meaningfully

4    challenge the LAHD's *original* determination.

5         121.    Stated simply, via the express PCO provisions addressed above

6    the City seeks to "stack the deck" heavily and impermissibly in its favor in the

7    hopes that, by making the post-deprivation process so partial, biased, burdensome,

8    time consuming, difficult and fundamentally unfair for affected hotel owners, and in

9    particular hotels like the Cecil that have hundreds of rooms, that the LAHD's

10   determinations would effectively be immune from substantive factual or legal

11   challenge. The City's conduct, and the provisions of the PCO referenced above,

12   undeniably violate and are intended to violate Plaintiffs' due process rights and/or

13   have been advanced in deliberate disregard of Plaintiffs' constitutional rights.

14            *"As Applied" Pre- and Post-Determination Due Process*

15                   *Violations Under the PCO*

16        122.    As noted above, the PCO does not provide for any pre-

17   determination notice or hearing. While the PCO undeniably was "applied" to the

18   Cecil by the LAHD, it did not in fact provide Plaintiffs with any pre-determination

19   notice or due process. Similarly, for the same reasons the PCO's post-determination

20   appellate procedures are facially defective, they also are defective "as-applied" to

21   the Plaintiffs. Specifically, in its prior Motion to Dismiss, the City attempted to

22   preclude Plaintiffs from pursuing their constitutional violations by falsely claiming

23   the PCO had not yet been "applied" to the Cecil, when in fact the City's own

24   official zoning file on the Cecil revealed, contrary to the City's representations, that

25   the Cecil in fact had been "brought under" the PCO, and that the LAHD had applied

26   the PCO to the Cecil.  That application has recently been confirmed by the

27   deposition of a City employee.

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

1

2

*Appeal of "Exemption" Request Also Facially*

*and "As Applied" Violates Due Process*

3        123.    In addition to post-determination appellate procedures, the PCO

4    also provides a mechanism for affected hotel owners to request a post-determination

5    "exemption" from the PCO. Stated simply, the "exemption" provisions of the PCO

6    are designed to circumvent the provisions of the State Ellis Act (Cal. Gov. Code

7    §§7060 *et seq.*), which the City acknowledges in the PCO pre-empts the

8    enforcement of the ordinance unless the hotel subjected to the PCO is a "Residential

9    Hotel" as defined in Health and Safety Code §50519(b). *See* Gov. Code §7060(a)

10   (setting forth the Ellis Act exception). As an initial matter, the "Exemption"

11   provisions of the PCO are legally deficient because they wrongfully purport to place

12   the burden of proving the Ellis Act "exception" on hotel owners, when under the

13   law the burden rests squarely on the City.

14        124.    In addition to violating the Ellis Act, the PCO's "exemption"

15   provisions are constitutionally inadequate because following the denial of an

16   "exemption" request by a hotel owner, the PCO requires that the owner "appeal"

17   from the exemption denial via nearly the same process as the PCO post-

18   determination appellate process set forth above. Thus, the "exemption" appellate

19   process is unconstitutional both facially and "as applied" for the same reasons the

20   process for appealing the LAHD's residential hotel determinations are defective.

21            *"As Applied" Substantive Due Process*

22            *Violations Under the ICO and PCO*

23        125.    The Due Process Clause of the Fourteenth Amendment of the

24   United States Constitution contains a substantive component that protects entities

25   such as Plaintiffs against arbitrary, capricious or excessive governmental action and

26   bars certain government actions regardless of the procedures used to implement

27   them; *i.e.*, substantive due process addresses the underlying legitimacy of the

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

government's actions. Substantive due process protects against abusive legislative and agency actions, and has been held applicable to zoning and other land use legislation and regulations. As such, Plaintiffs challenge and seek damages for the actions of the City under both the ICO and proposed PCO, including the enactment, implementation and administration of those ordinances by LAHD, on substantive due process grounds.

126.    At the time the ICO and PCO were enacted by the City Council, it expressly was relying on the information being provided to it by the LAHD purportedly showing a significant threat posed to the residential housing stock in the City, and specifically the impending or threatened loss of a substantial number of residential units to conversion or demolition.

127.    In this regard, both before or contemporaneously with the enactment of the ICO, the City, and specifically the LAHD, came under intense pressure from homeless advocacy groups to extend the ICO prohibitions to "commercial transient hotels" like the Cecil that do rent *some* of its rooms to occupants for periods of more than 30 days. As the allegations set forth above note, however, the policymakers behind the ICO *expressly declared* that the ICO was *not* intended to cover or burden commercial transient hotels that also rented out some residential units, and indeed they expressly cautioned the LAHD against seeking to impose restrictions under the ICO on hotels like the Cecil who paid significant TOT fees to the City. The LAHD, however, bowing to pressure from homeless advocacy groups, nevertheless targeted the Cecil and other similar hotels, despite the findings of the Residential Hotel Unit, the City's Office of Finance, and the audits of the TOT data that it was not a residential hotel and was not intended by the Council to be covered by the ICO, because they provided the LAHD with an opportunity to show great "results" by significantly and permanently expanding the inventory of residential hotel units by "capturing" all of the Cecil's nearly 600 rooms– rooms that homeless groups argued would otherwise be "lost" forever to renovation and

- 49 -

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

conversion.

128.    As such, the LAHD's implementation and enforcement of the ICO and PCO, and specifically its Herculean yet improper efforts to "capture" and freeze all renovation and conversion efforts at the Cecil, as alleged in more detail above, runs contrary to the public interest purportedly underlying the enactment of the ICO and PCO, is arbitrary and unreasonable, and constitutes constitutionally outrageous misconduct and official abuse that violates Plaintiffs' substantive due process rights.

129.    The substantive due process violations arising from LAHD's impermissible determination that the Cecil was/is a residential hotel subject to the ICO form the foundation of, and extend equally to, the PCO and APCO, and Plaintiffs allege that the City, and in particular the LAHD, has merely sought to extend and further insulate its improper and constitutionally infirm ICO coverage determination into the PCO and APCO by engaging in the various procedural due process violations listed above with respect to the PCO and APCO, and by falsely claiming that the Cecil had not yet been "brought" under the ordinances, when in fact the City knows the Cecil *has been* brought under such ordinances.

130.    Indeed, when the actions taken in connection with the LAHD's arbitrary and malicious assault on the Cecil are placed into proper context, the motives behind, and the reasons for, the various constitutionally infirm provisions of the PCO and APCO become crystal clear: despite Herculean efforts to locate evidence to support its determination, the LAHD had and has no legitimate basis for declaring the Cecil to be a residential hotel under either the ICO or PCO, the Cecil has since "called the LAHD's bluff" by demanding that it provide Plaintiffs with all of its facts and evidence – none of which exist – and in response the City, led by the LAHD, now seeks to concoct an elaborate procedure in the PCO and APCO for the sole and improper purpose of excusing the LAHD from ever having to explain or justify its original residential hotel determination and to permit other organizations

- 50 -

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1    multiple opportunities to "fill in" the administrative record with "evidence" that it

2    now admittedly lacks.

3           131.    In this regard, Plaintiffs note that if there was any reasonable

4    basis for the LAHD's determination, there would be no reason to imbed numerous

5    procedural due process violations into the PCO, and the LAHD also long ago would

6    have opened its files to Plaintiffs and fully explained the factual and legal grounds

7    for its determination – files that it steadfastly has refused to share with Plaintiffs, yet

8    ironically has opened freely and repeatedly to those homeless advocacy groups who

9    are lobbying the LAHD mercilessly to shut down the Cecil under the ICO/PCO so it

10   can be converted "on the cheap" into to a mega-SRO hotel for the homeless.

*"As Applied" Equal Protection Violations*

*Under the ICO and PCO*

13          132.    The Equal Protection Clause of the Fourteenth Amendment

14   secures every person within the state's jurisdiction against intentional and arbitrary

15   discrimination, whether through the express terms of a statute or through the

16   improper execution of a statute by duly constituted agents. Under equal protection, a

17   statutory classification "must be reasonable, not arbitrary, and must rest upon some

18   ground of difference having a fair and substantial relation to the object of the

19   legislation, so that all persons similarly situated shall be treated alike." Equal

20   protection also applies to agency decisions where a plaintiff "has been treated

21   differently from others similarly situated and there is no rational basis for the

22   different treatment" and further protects persons against arbitrary and capricious

23   agency action targeting them.

24          133.    As discussed above, the City violated the Equal Protection

25   Clause when, pursuant to the ICO, the LAHD specifically targeted the Cecil Hotel,

26   even though it knew based on its own investigation that the hotel was not a

27   residential hotel pursuant to H&S 2005 §50519. There was no rational basis for

28   treating the Cecil differently from other commercial transient hotels within the City.

**AUGUSTINI LAW OFFICES**
*ATTORNEYS AT LAW*

**PLAINTIFFS' AMENDED COMPLAINT**

Indeed, because the Cecil and those other hotels were and are not residential hotels (and thus were not and are not properly the subject of regulation under the ICO), and further because the LAHD possessed and possesses definitive evidence (including the audited TOT data and its own inspection reports) that the Cecil was and is *not* a residential hotel, it acted in an arbitrary, irrational, and deliberately discriminatory way by doing anything and everything possible, whether legal or illegal, proper or improper, to bring the Cecil under the restrictions of the ICO and PCO.

134.    The equal protection violations stemming from the ICO have been extended to, and are expressly incorporated, into the LAHD's actions under PCO and APCO, thereby rendering its actions thereunder constitutionally infirm for the same reasons discussed in the due process sections above.

### The Above-Described Constitutional
### Violations Continue In the City's APCO

135.    As noted above, apparently in direct response to Plaintiffs' arguments in opposition the City Motion to Dismiss, the City recently enacted the APCO. The APCO, while purporting to address several (but not all) of Plaintiffs' constitutional claims, do not substantively address, let alone redress, the fundamental constitutional defects in the ICO and PCO, nor does it redress the equal protection or substantive due process violations arising from its January 2007 residential hotel determination – a determination that the LAHD has extended to the PCO and APCO. For example, the APCO, like its two predecessor ordinances, fails to provide any pre-determination notice and hearing procedures. Further, and perhaps more important here, had the City provided such procedures, they would provide no true review because the LAHD admits it previously made the final core determination – under both the ICO and PCO –  that the Cecil is a residential hotel regardless of which version of the ordinance is in place, and regardless of what superficial amendments it may make the ordinance.

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1   136.   Similarly, while the City's APCO makes minor, non-substantive

2   revisions to the post-determination appellate process, the APCO is still fatally

3   deficient because the process provided is completely controlled and determined by

4   the LAHD – the very agency that made the improper determination in 2007, and has

5   repeated it on many occasions since then, including its determinations the Cecil was

6   subject to the ICO and PCO. And also like the ICO and PCO, the City continues in

7   the APCO to refuse to permit any appropriate post-determination notice and hearing

8   procedures before a fair and impartial tribunal.

9   137.   Moreover, the City continues to require Plaintiffs to follow

10  biased procedures that improperly place the burden on Plaintiffs to *disprove* the

11  City's determination in a system of review that imposes improper and arbitrary

12  methods of proof, purports to reverse the burden of prove as to the application of the

13  Ellis Act, permits LAHD personnel to intervene and influence the outcome of the

14  hearings before the LAHD, permits third parties to sandbag Plaintiffs with new

15  evidence not previously disclosed or used by the LAHD in making its

16  determination, and still permits the LAHD to attempt to justify its decision *after the*

17  *fact* through reliance on post-determination evidence it did not have or use in

18  making its determination, and permits the City to delay – for many months – the

19  completion of the administrative process.  Even more importantly, the evidence that

20  just recently has come to light confirms that the City is seeking to divert this action

21  to the ordinance's administrative process so that it can avoid discovery by Plaintiffs

22  – discovery that would show that several individuals within the LAHD intentionally

23  disregarded conclusive investigations by its own Residential Hotel Unit and other

24  City agencies in their improper quest to "get" the Cecil.

25  138.   It is clear that the City intends to defend its numerous prior

26  wrongful determinations at all costs, regardless of whether it has any basis, and the

27  entire administrative procedure set forth in the PCO and APCO is merely a sham

28  designed to insulate its determination from any substantive challenge while lending

**PLAINTIFFS' AMENDED COMPLAINT**

a false (albeit fairly transparent) impression that it is attempting to comply with the requirements of post-determination due process. Thus, the APCO is and remains defective on facial procedural due process grounds and on "as applied" equal protection and substantive due process grounds for the same fundamental reasons the ICO and PCO were and are defective. Stated differently, none of the constitutional defects contained in the ICO or PCO have been addressed or adequately rectified, nor at this point can they be redressed via any set of revisions or amendments.

139.    As a direct and proximate result of the City's actions and omissions as described above, and specifically its numerous and substantial constitutional violations, Plaintiffs have suffered and continue to suffer substantial damages in an amount to be proven at trial, but in no event less than $10,000,000, and which includes lost revenues, expenses incurred complying with unconstitutional ordinances, lost opportunities caused by the Plaintiffs' inability to operate the Cecil as envisioned in its business plans, and other damages that will be presented at or before trial. Further, unless the City is immediately enjoined from continuing to engage in such misconduct, and specifically are enjoined from applying the ICO, PCO and/or APCO to Plaintiffs, Plaintiffs will suffer immediate and irreparable harm.

140.    Plaintiffs' §1983 claims may be asserted without the need to exhaust any purported remedies, although Plaintiffs note that none of the ordinances have provided any pre-determination due process, and the procedures in the PCO and APCO, in addition to being constitutionally infirm and invalid, literally are not available and cannot be imposed on Plaintiffs because the City admittedly has not yet provided Plaintiffs with the "notice" by which the post-determination appellate process is purportedly triggered. Further, administrative exhaustion is either inapplicable or not required for the multitude of reasons alleged in more detail above and in Plaintiffs' Opposition to the City's prior Motion to Dismiss.

- 54 -

**PLAINTIFFS' AMENDED COMPLAINT**

1

**SECOND CAUSE OF ACTION**

2

[Declaratory Relief]

3      141.    Plaintiffs hereby incorporate the allegations of paragraphs 1-140,

4   inclusive, and realleges the same as if fully set forth herein.

5      142.    Actual controversies have arisen and presently exist between the

6   parties regarding the constitutionality and correct statutory construction and

7   application of the ICO, the PCO, the APCO, the Ellis Act, H&S §50519(b)(1), and

8   related statutory provisions relating to "residential hotels", and whether the Cecil at

9   any material time has been a "residential hotel" as that term is defined in H&S

10  §50519(b)(1), and the respective legal rights and obligations of each of the parties in

11  connection with those controversies.

12     143.    Plaintiffs desire a judicial determination of these controversies

13  and a judicial declaration as to such matters.

14     144.    A judicial declaration is necessary and appropriate at this time in

15  order that Plaintiffs may ascertain whether the Cecil is a "residential hotel" as

16  defined in H&S §50519(b)(1), whether the efforts of the City or its agencies to

17  subject the Cecil and Plaintiffs to the ICO, PCO and APCO were or are preempted

18  or violated the Ellis Act and/or the H&S §50519(b)(1), and whether the ICO, PCO

19  and APCO are constitutional on their face and as applied.

20     145.    Therefore Plaintiffs seek a judicial declaration that, regarding

21  each and all of the following controversies as to the proper interpretation and

22  application of the specified statutory provisions, the Plaintiffs' contentions are

23  correct:

24          A.    Plaintiffs contend the Cecil is and at all material times has

25  been "primarily" a "transient hotel," and never has been "primarily" a "residential

26  hotel" as defined in H&S §50519(b)(1); and the City denies that contention;

27          B.    Plaintiffs contend that, assuming the Cecil was or is

28  otherwise subject to the ICO, the PCO and/or the APCO, those ordinances are all

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 55 -

1    unconstitutional both on their face and as applied to the Cecil and Plaintiffs; and the

2    City denies that contention;

3              C.    Plaintiffs contend that, assuming the Cecil would be

4    otherwise be subject to the APCO, that ordinance is unconstitutional both on its face

5    and as applied to the Cecil and Plaintiffs; and the City denies that contention;

6              D.    Plaintiffs contend that, assuming the Cecil were at any time

7    subject to and of the three City ordinances at issue herein, the policies and

8    procedures utilized by the City and specifically the LAHD to implement and enforce

9    all three ordinances are invalid and unconstitutional; and the City denies that

10   contention;

11             E.    Plaintiffs contend all three City ordinances at issue herein,

12   when enacted, were legally invalid ordinances; and the City denies that contention;

13             F.    Plaintiffs contend all three City ordinances at issue herein are

14   each preempted by the Ellis Act provisions of Gov't Code §§7060 *et seq.*; and the

15   City denies that contention;

16             G.    Plaintiffs contend the Cecil is not excepted from the

17   protections and preemptions contained in the Ellis Act; and the City denies that

18   contention;

19             H.    Plaintiffs contend the City had and has the burden of proving

20   the Cecil is a residential hotel under H&S §50519(b)(1) before subjecting the Cecil

21   to the ICO, the PCO and the APCO, and the City denies that contention;

22             I.    Plaintiffs contend the City, and more particularly the LAHD,

23   did ***not*** use the proper legal standard to determine whether the Cecil is a residential

24   hotel subject to the ICO, PCO and/or APCO; and the City denies that contention;

25             J.    Plaintiffs contend the City, and more particularly the LAHD,

26   arbitrarily and capriciously, and without any substantial factual or legal basis,

27   determined the Cecil was and is residential hotel subject to the ICO, the PCO and

28   the APCO; and the City denies that contention;

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 56 -

1      K.     Plaintiffs contend the City has the burden of proving the

2  Cecil is a residential hotel under H&S §50519(b)(1), properly construed, before

3  placing the Cecil on any list of "residential hotels," before determining the Cecil

4  was a "residential hotel" under the ICO, PCO, APCO and any other City code or

5  ordinance which by its terms applies to "residential hotels" as defined in H&S

6  §50519(b)(1), and before attempting to enforce the provisions of such ordinances

7  against the Cecil; and the City denies those contentions;

8      L.     Plaintiffs contend the City has the burden of proving the

9  existence and applicability of the express "exception" to the prohibitions and

10  preemption provisions as set forth in the Ellis Act, Gov't Code § 7060(a); the City

11  denies that contention;

12      M.     Plaintiffs contend the residential hotel unit "presumption" in

13  the PCO and APCO which requires Plaintiffs to prove the non-residential status of

14  every hotel room in the Cecil as of October 11, 2005, violate the California and

15  Federal Constitutions; and the City denies that contention;

16      N.     Plaintiffs contend the appellate procedures in the PCO and

17  APCO, including without limitation the LAHD notice provisions and its procedures

18  for challenging the City's Ellis Act "exemption" and its "residential hotel"

19  determination, violate the California and Federal Constitutions; and the City denies

20  that contention; and

21      O.     Plaintiffs contend they are not required to exhaust any

22  administrative or other remedies provided under the PCO and APCO because such

23  remedies were not available when this action was filed, such remedies were

24  specially tailored by the City to deny Plaintiffs any effective legal remedy, and

25  because resort to such purported remedies is not required, would be futile, would

26  expose Plaintiffs to a multiplicity of legal actions and would cause irreparable harm

27  to Plaintiffs and thus is excused; and the City denies that contention.

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

146. The declaratory relief requested above is both proper and necessary at this time so the parties may ascertain their respective rights, duties and obligations under the various applicable statutory provisions, to determine whether the three disputed ordinances are preempted by the Ellis Act, and to determine the validity of the disputed ordinances under the California and Federal Constitutions. Further, absent the declaratory relief requested herein, Plaintiffs have no adequate remedy to determine what the rights, duties and obligations of the parties were and are, or the proper construction and application of the disputed statutes and ordinances.

147. To the maximum extent permitted by law, Plaintiffs seeks recovery of its reasonable attorney fees and costs incurred in connection with this claim.

### THIRD CAUSE OF ACTION

### [PRELIMINARY AND PERMANENT INJUNCTION AGAINST ENFORCEMENT OF RSO, PROPOSED PCO AND THREATENED COLLECTION OF SCEP FEES]

148. Plaintiffs hereby incorporate the allegations of paragraphs 1-140, inclusive, and realleges the same as if fully set forth herein.

149. The City's wrongful actions and further threatened wrongful actions, if not enjoined both preliminarily and permanently, will cause irreparable injury to Plaintiffs, who have no adequate remedy at law.

150. Such wrongful and threatened wrongful actions include, without limitation:

A. Continued enforcement of the PCO and APCO in violation of the United States and California Constitutions, as well as the preemption provisions of the Ellis Act, including without limitation: issuance of stop work orders and refusals to issue construction permits in order to prevent Plaintiffs from making needed repairs as well as constructing improvements and

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

1   rehabilitating existing facilities, and threats to "deem" all 587 rooms at the Cecil to

2   be "residential units" subject to the ICO, and thus available only for use by

3   residential guests, thereby compelling Plaintiffs to operate exclusively as a

4   "residential hotel;"

5                 B.      Continued harassment and potential collection litigations

6   relating to the LAHD's arbitrary demands that Plaintiffs pay SCEP fees not owing

7   under the RSO, SCEP or other applicable law, which litigations will result in a

8   needless multiplicity of actions;

9                 C.      Threatened enforcement of the PCO and APCO, including

10   all wrongful existing and future wrongful discussed more fully above.

11         151.   Preliminary and permanent injunctive relief is necessary:

12                 A.      To prevent irreparable injury to the valuable property

13   rights held by Plaintiffs, to avoid a multiplicity of actions challenging and seeking to

14   interpret the PCO and APCO, and because the pecuniary injury caused by the City's

15   wrongful conduct cannot be ascertained with certainty, and in any event would not

16   afford adequate relief to Plaintiffs;

17                 B.      Because the Cecil constitutes unique real property as a

18   matter of law, and further because constitutional injuries constitute irreparable harm

19   under the law;

20                 C.      Because Plaintiffs are likely to prevail on the merits and

21   are legally entitled to the relief they it seek herein, and thus injunctive relief is

22   necessary and appropriate to restrain the continuation by the City and the LAHD of

23   the improper acts alleged herein — actions that are unconstitutional, legally invalid,

24   and are outside the scope of and in excess of the City's legal authority; and

25                 D.      The City has threatened to, and if not judicially restrained

26   intends to, perform and continue to take actions in violation of the rights of

27   Plaintiffs with respect to the claims and issues raised herein, and if the City is

28   permitted to do so, the likely result will be that any judgment ultimately rendered in

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 59 -

**PLAINTIFFS' AMENDED COMPLAINT**

Plaintiffs' favor will be ineffectual.

152.    In contrast to Plaintiffs' likelihood of success on the merits and the irreparable harm that will result in the event City's actions and threatened actions are not enjoined, neither the City nor the general public will be harmed by such a preliminary and/or permanent injunction preventing the application and enforcement of unconstitutional and legally invalid provisions of the PCO and APCO or from applying or enforcing those ordinances against hotels, like Plaintiffs, that are not residential hotels as defined by H&S §50519.

153.    To the extent permitted by law, Plaintiffs also seeks the recovery of its attorney fees and costs incurred in connection with this claim.

**FOURTH CAUSE OF ACTION**

**[VIOLATIONS OF ARTICLE 1, SECTION 7 OF THE CALIFORNIA CONSTITUTION]**

154.    Plaintiff hereby incorporates the allegations of paragraphs 1-140, inclusive, and realleges the same as if fully set forth herein.

155.    The City's violations of due process and equal protection, as more fully described above, also constitute violations of the due process and equal protection provisions of the California Constitution, and in particular Article I, Section 7 thereof.

156.    Unless the City is immediately enjoined from continuing to engage in such misconduct, and specifically is enjoined from applying the PCO and APCO to Plaintiffs, Plaintiffs will suffer immediate and irreparable harm.

**PRAYER FOR RELIEF**

**WHEREFORE,** PLAINTIFFS and each of them pray for the following orders, decrees and judgment on their Complaint:

FIRST CAUSE OF ACTION - VIOLATIONS OF 42 U.S.C. §1983

1.    For a temporary restraining order, preliminary injunction and permanent injunction requiring the City and all of its respective agencies, officials, employees, servants, agents, contractors and representatives, and each of them

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

**PLAINTIFFS' AMENDED COMPLAINT**

[individually and collectively, the "City"] to show cause why the City should not be temporarily restrained, preliminarily enjoined during the pendency of this action, and permanently enjoined thereafter, from, directly or indirectly, taking any of the following actions against Plaintiffs or the Cecil or any of their members, employees, agents, representatives, contractors or any other person acting on behalf of Plaintiffs or the Cecil [individually and collectively, the "Cecil"]:

           A.    Applying or enforcing, or attempting to apply or enforce against the Cecil any City determination made under the ICO, or any provision of the PCO, APCO or any similar successor ordinance enacted by the City;

           B.    Prohibiting the Cecil from taking any action and/or requiring the Cecil to refrain from taking any action based on any City determination made under the ICO, or any provision of the PCO, APCO or any similar successor ordinance enacted by the City;

        2.    For compensatory damages according to proof, but not less than $10 million;

        3.    For their reasonable attorneys fees incurred herein.

<u>SECOND CAUSE OF ACTION - DECLARATORY RELIEF</u>

        4.    For a judicial declaration that each of Plaintiffs' contentions, as set forth above, is true and correct, and each of the City's contentions is neither true nor correct;

<u>THIRD CAUSE OF ACTION - INJUNCTIVE RELIEF</u>

        5.    For a temporary restraining order, preliminary injunction and permanent injunction requiring the City and all of its respective agencies, officials, employees, servants, agents, contractors and representatives, and each of them [individually and collectively, the "City"] to show cause why the City should not be temporarily restrained, preliminarily enjoined during the pendency of this action, and permanently enjoined thereafter, from taking, directly or indirectly, any of the

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 61 -

**PLAINTIFFS' AMENDED COMPLAINT**

following actions against Plaintiffs or the Cecil or any of their members, employees, agents, representatives, contractors or any other person acting on behalf of Plaintiffs or the Cecil [individually and collectively, the "Cecil"]:

A.      Applying or enforcing, or attempting to apply or enforce against the Cecil any provision of the PCO, APCO or the SCEP program or any other regulatory provision of any California statute, City ordinance or the Municipal Code which provision requires the subject of such regulation be a "residential hotel" as defined in H&S Code §50519(b)(1);

B.      Prohibiting the City from taking any action or requiring the Cecil to refrain from taking any action based on any provision of, or any determination made by the City under the ICO, PCO, APCO or the SCEP program or any other provision of any California statute, City ordinance or the Municipal Code to the extent such provision purports to authorize the City or any of its agencies to regulate or to require or prohibit any action or inaction by the Cecil, or to condition any action or inaction by the Cecil on payment of any fee or suffering any other financial imposition, by reason of the fact such statutory provision purports to apply to "residential hotels" as defined in H&S Code §50519(b)(1);

C.      Requiring the Cecil to apply for or obtain any purported "exemption" or "exception," or conditioning the Cecil's operation as a "transient hotel" upon the Cecil first applying for or obtaining any purported "exemption" or "exception," to any provision of the Ellis Act or in order to avoid the application of the PCO, APCO, the SCEP program or any other regulatory provision of any California statute, City ordinance or the Municipal Code which provision requires the subject of such regulation be a "residential hotel" as defined in H&S Code §50519(b)(1);

D.      Preventing, obstructing, hindering, delaying or otherwise interfering with the operation of the Cecil to the extent such operations are

**PLAINTIFFS' AMENDED COMPLAINT**

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1    consistent with all laws regulating the operation of the Cecil as a "transient hotel" as

2    defined in H&S Code §50519(b)(1); or

3              E.    Preventing, obstructing, hindering, delaying or otherwise

4    interfering with any action taken or undertaken by the Cecil to commence and

5    complete construction of any and all improvements and repairs otherwise permitted

6    under State and City building codes and regulations applicable to "transient hotels"

7    as defined in H&S Code §50519(b)(1);

8                          FOURTH CAUSE OF ACTION

9              ARTICLE 1, SECTION 7 OF THE CALIFORNIA CONSTITUTION

10         6.    For a temporary restraining order, preliminary injunction and

11   permanent injunction requiring the City and all of its respective agencies, officials,

12   employees, servants, agents, contractors and representatives, and each of them

13   [individually and collectively, the "City"] to show cause why the City should not be

14   temporarily restrained, preliminarily enjoined during the pendency of this action,

15   and permanently enjoined thereafter, from, directly or indirectly, taking any of the

16   following actions against Plaintiffs or the Cecil or any of their members, employees,

17   agents, representatives, contractors or any other person acting on behalf of Plaintiffs

18   or the Cecil [individually and collectively, the "Cecil"]:

19             A.    Applying or enforcing, or attempting to apply or enforce against

20   the Cecil any City determination made under the ICO, or any provision of the PCO,

21   APCO or any similar successor ordinance enacted by the City; and

22             B.    Prohibiting the Cecil from taking any action and/or requiring the

23   Cecil to refrain from taking any action based on any City determination made under

24   the ICO, or any provision of the PCO, APCO or any similar successor ordinance

25   enacted by the City;

26

27

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 63 -

**PLAINTIFFS' AMENDED COMPLAINT**

1                              ALL CAUSES OF ACTION

2             7.     That Plaintiffs recover their respective costs of suit incurred

3 herein; and

4             8.     That Plaintiffs recover such other and further legal and equitable

5 relief as the Court deems just and proper.

6

7  Dated:  November 14, 2008         **AUGUSTINI LAW OFFICES**

8                              **FINLAYSON, AUGUSTINI & WILLIAMS LLP**

9

10

11               By: _____

12                        ALFRED E. AUGUSTINI

13                      AUGUSTINI LAW OFFICES
                    ATTORNEYS FOR PLAINTIFFS

14         640 SOUTH MAIN STREET PARTNERS, LLC
              AND HSC PROPERTIES, LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' AMENDED COMPLAINT**