1

2  **AUGUSTINI LAW OFFICES**
   Alfred E. Augustini        SBN 43204
3  alaugie@alaugie.com
   515 S. Figueroa St., Ste. 321
4  Los Angeles, CA 90071
   Tel: 213-629-8888
5  Fax: 213-688-7600

6  **GORDEE, NOWICKI & AUGUSTINI LLP**
   Jeff Augustini        SBN 178358
7  jaugustini@gna-law.com
   8105 Irvine Center Dr., Ste. 870
8  Irvine CA 92618
   Tel: 949-567-9923
9  Fax: 949-567-9923

10

11 Attorneys for Plaintiffs:
   640 SOUTH MAIN STREET PARTNERS, LLC, AND
12 HSC PROPERTIES, LLC

13 **UNITED STATES DISTRICT COURT**
   **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**
14

15 | 640 SOUTH MAIN STREET PARTNERS, LLC | Case No. 08-cv-3611–DDP-JTL |
   AND HSC PROPERTIES, LLC,

16                                                   Magistrate Judge: Hon. Alicia G. Rosenberg

17                    Plaintiffs,

        vs.                                          **DISCOVERY MATTER**
18                                                   **PLAINTIFFS' OPPOSITION TO**
   CITY OF LOS ANGELES,                              **COUNTERCLAIMANTS'**
19                                                   **MOTIONS TO COMPEL PMK**
                                                     **DEPOSITIONS AND RELATED**
20                    Defendant.                     **REQUESTS FOR PRODUCTION**
                                                     **OF DOCUMENTS**
21 LA CAN, a non-profit corporation, ALVIN
   TAYLOR, AND SAVERIO MANISCALCO,
22 individuals.                                      **Date:  July 8, 2011**
                                                     **Time: 10:00 a.m.**
23                    Counterclaimants,              **Place: Crtrm "D"**

24     vs.

25 640 SOUTH MAIN STREET PARTNERS, LLC               Action Filed:       May 5, 2008
   AND HSC PROPERTIES, LLC,                          Action Removed:     June 3, 2008
26                                                   Discovery Cut-Off:  August 12, 2011
                    Counterdefendants.               Trial Date:         February 7, 2012
27

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 1 -

## I.   **Preliminary Statement.**

The Court previously shortened time for both Plaintiffs' opposition to and the hearing on Intervenors' two motions to compel Plaintiffs/Counterdefendants to respond to two separate sets of Intervenors' discovery requests, consisting of 3 PMK deposition designation notices (4 duplicate PMK notices were sent to each Plaintiff/Counterdefendant, but Intervenors have withdrawn 1 duplicate set of PMK notices regarding the structure of Plaintiffs' LLCs), and a Request For Production of Documents ("RFP") (again, duplicates were served on each Plaintiff/Counterdefendant).

The Court, in a telephonic conference on June 28th, shortened time to (1) permit Intervenors' to file their motion to compel regarding their RFPs on June 29th, and shortened time to Plaintiffs to file this opposition to both motions on July 6th. Intervenors' did not file their motion to compel regarding the RFPs until after business hours on June 29th, and Plaintiffs' counsel was required to attend an all-day mediation conference on June 30th, so Plaintiffs' counsel has been required to prepare this opposition, in effect, on only 3 court days' notice.

Plaintiffs' counsel is not complaining – Plaintiffs have accepted this arrangement. But as a result of the limited time available, Plaintiffs' counsel begs the Court's indulgence for the shortcomings the Court will no doubt find in this opposition. For example, in the interests of time, Plaintiffs eschewed the usual practice of submitting a separate Memorandum and supporting Declaration. Accordingly, relevant exhibits have been attached to this Memorandum, and factual assertions by counsel have been incorporated into the argument herein. In addition, technical requirements specified in Local Rules may well have been "bent."

Plaintiffs filed extensive and detailed objections to each of Intervenors' discovery requests. Intervenors' moving papers derisively characterize these objections as mere "boilerplate" (*e.g.*, RFPs Memo at p. 4, ln. 4, *et seq.*). But, as this Memorandum will hopefully demonstrate, Plaintiffs have asserted only garden-

OPPOSITION TO COUNTERCLAIMANTS' MOTIONS TO COMPEL DISCOVERY

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

variety and appropriate objections to Intervenors' inappropriate "fishing expeditions" as to matters having nothing whatsoever to do with Intervenors' pending counterclaims.

Likewise, Intervenors repeatedly suggest in their motion papers that Plaintiffs have "stonewalled" discovery and refused to provide any discovery. This charge is also inaccurate. Plaintiffs have repeatedly offered to provide all non-privileged discovery arguably pertinent to Intervenors' counterclaims, but Intervenors have arbitrarily rejected those proposals, just as they have arbitrarily refused to present Messrs. Taylor and Maniscalco for their depositions by Plaintiffs/Counterdefendants.

With respect to both sets of discovery requests (*i.e.*, PMK depos and RFPs), Intervenors generally seek to compel discovery that *literally* is completely divorced from the factual issues presented in Intervenors' counterclaims. The obvious explanation for this overreach is that Intervenors seek information *unrelated* to the pending counterclaims – as to both time and subject matter. Why? Perhaps to obtain some factual basis for asserting *new claims*, perhaps on behalf of new parties, or perhaps to obtain information Intervenors seek to use to oppose Plaintiffs' pending LAHD Administrative Appeal regarding Cecil's alleged "residential hotel" status under the *current* Residential Hotel Ordinance.

The following table shows the categories and date ranges of the information being sought by Intervenors may be helpful:

| **Subject Matters** | **PMK Date Range** | **RFP Date Range** | **IVs' Offer** |
| --- | --- | --- | --- |
| Residential Status | May 2006-Present | Unlimited | May 2006-Present |
| Maintenance/Operation | May 2006-Present | Unlimited | May 2006-Present |
| Condition/Habitability | | Unlimited | May 2006-Present |
| Construction | | Unlimited | May 2006-Present |
| Pltfs' Cecil Purchase | May 2006-Present | | |

OPPOSITION TO COUNTERCLAIMANTS' MOTIONS TO COMPEL DISCOVERY

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1    A simple, initial taste of the outrageousness of Intervenors' discovery

2    demands:  The Cecil Hotel was built in the 1920's and is the 10th largest hotel in the

3    City, with 598 rooms. Yet Intervenors felt no compunction initially demanding that

4    Plaintiffs produce all documents (including "all communications" with anyone) that

5    "refer" in any way to the "condition" of the Hotel or any of its rooms at any time

6    over the past 90-years!

7         Plaintiffs' discovery objections to both the RFPs and PMKs come in 3 flavors:

8         • Lack of relevance, and undue burden and cost because the information

9    sought is voluminous and pertains to moot or non-existent claims or issues;

10        • Lack of relevance, and undue burden and cost because the information

11   sought is voluminous and pertains to subject matters and time periods immaterial to

12   Intervenors' non-moot pending claims, and

13        • The State Constitutional privacy privilege. This privilege is generally

14   applicable to almost all of the RFPs and the bulk of the PMK notices because those

15   notices, for example, demand five years of all Hotel records relating to Hotel

16   "residential status," "condition," "maintenance," "operations," "habitability" and

17   "construction." Clearly, many if not most of these records are not only immaterial to

18   Intervenors' pending claims, they also include personal identification information of

19   Hotel guests – names, addresses, telephone numbers, etc. – which information is

20   clearly privileged from disclosure and production due to the privacy protections

21   established in Section 1 of the California Constitution. Although such privilege is not

22   "absolute," Intervenors have failed and indeed have repeatedly refused to make the

23   preliminary showings California law requires in order for Intervenors to overcome

24   this important Constitutional privilege.

25        Relevance and materiality are the touchstones of legitimate discovery, so this

26   Memorandum first reviews and analyzes all Intervenor counterclaims not mooted by

27   Judge Pregerson's prior dismissal order, and then addresses the reasons Plaintiffs'

28   objections both to Intervenors' RFPs and PMKs are justified because the subject

- 4 -

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

matters and time periods used in Intervenors' discovery demands bear no relation whatsoever to the subject matters and time periods of Intervenors' claims. Then Plaintiffs explain how most of Intervenors' PMK and RFP demands have – admittedly – been specifically calculated to obtain personal private identity information of numerous Cecil guests, in violation of the privacy protection guaranties set forth in Section 1 of the California Constitution, and in violation of applicable case law that bars production of such information in the absence of specific affirmative showings required under applicable case law.

## II.   Intervenors' Counterclaims.

### A.   Intervenors' ICO and RHO Claims

On or about June 25, 2008, Intervenors' filed their motion to intervene and their then-proposed counterclaims, including the following claims under two different City "residential hotel" Ordinances:

• "Violation of the ICO" (Third Cause of Action), referring to the City's original "moratorium," which barred the "conversion" of "residential hotels," and which was in effect from May 2006 until May 2008;

• "Violation of the Final Ordinance" (Fourth Cause of Action), the subject ordinance being defined by Intervenors as the RHO adopted by the City in May 2008 to replace the expired ICO moratorium; and

• "Declaratory Relief" (First Cause of Action) regarding the Cecil's alleged status as a "residential hotel" under both the ICO and 2008 RHO.

Intervenors' filing occurred about a year after Plaintiffs filed their original complaint in State Court, which action was subsequently removed the City to this Court. A copy of Intervenors' July 2008 motion to intervene in this action is attached as **Exhibit A**, and a copy of Intervenors' Counterclaims is hereto as **Exhibit B**.

At the time Intervenors filed their intervention motion, the City's original Interim Control Ordinance ("ICO") – a simple 2-year moratorium barring "residential hotel" conversions – had been introduced on October 11, 2005, became

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 5 -

1    effective in May 2005, and had already expired in May 2008, about two months

2    before Intervenors filed their motion. Thus, by the time Judge Pregerson granted the

3    intervention, the ICO had already been replaced by the City's original "permanent"

4    "Residential Hotel Ordinance," No. 179868. Copies of the ICO and original RHO are

5    attached as **Exhibit C** and **Exhibit D**, respectively.

6    Importantly, the ICO included <u>no</u> provision authorizing anyone (even the City)

7    to recover damages for any violation of the Ordinance, and even gave *the City* only

8    the right to *enjoin* violations of the Ordinance. In other words, the ICO granted no

9    "private right of action" to the Intervenors or any other third party.[1]

10   The Intervenors' motion to intervene cites only two legal grounds for

11   intervention pursuant to FRCP 24(a)(2):

12   (1)   That Intervenors had the required "significant interest" in the Cecil

13   Hotel because the RHO enacted by the City in May 2008 (No. 179868) specifically

14   authorized "interested parties" to enjoin violations and recover damages (but not to

15   seek declaratory relief), and that RHO specified both LA CAN (as a public interest

16   advocacy group) and Cecil residents, as "interested parties" regarding the RHO; and

17   (2)   That Intervenors should be allowed to intervene because their

18   "interests" were allegedly not adequately protected by the City – for reasons not

19   relevant to the present discovery issues.

20   Judge Pregerson granted the motion to intervene on October 15, 2008, and

21   Intervenors' proposed counterclaims were deemed filed as of that date. Plaintiffs did

22   not then attack the validity of any counterclaims, but it is apparent on the face of the

23   counterclaims, and as a matter of law, that several purported claims therein – claims

24   which Intervenors argue justify their disputed discovery requests – are either

25   nowhere to be found in their counterclaims, or were rendered nullities when the City,

26

27   [1] The City's <u>original</u> RHO (No. 179868) expired and was replaced on August

28   22, 2008 by the <u>current</u> RHO (No. 180175).

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 6 -

in August 2008, replaced the original RHO ordinance with the current RHO Ordinance.

The next significant procedural development affecting Intervenors' "RHO-related" counterclaims arose from several motions to dismiss the City filed attacking Plaintiffs' RHO claims under the ICO and both RHOs. Such motions ultimately resulted in Judge Pregerson issuing an order dated March 4, 2009. This Order, among other things, dismissed Plaintiffs' injunctive relief and declaratory relief claims under the ICO and original RHO on the grounds all declaratory and injunctive relief claims based on those Ordinances had been rendered moot by the expiration of the Ordinances.

Given the rationale of Judge Pregerson's March 4, 2009 Order, it's clear that, *mutatis mutandis*, expiration of the ICO and original RHO in May 2008 and August 2008, respectively, also rendered Intervenors' declaratory and injunctive relief claims moot.[2] *See* pp. 9, lns. 11-13 of Judge Pregerson's Order, a copy of which is attached as **Exhibit E**.

Judge Pregerson's Order, among other things, left in place Plaintiffs' 42 USC §1983 damage claims under both the ICO and original RHO, so, again, *mutatis mutandis*, presumably Intervenors may still pursue their damage claims under the original RHO. But Intervenors simply ignore how Judge Pregerson's Order, as the law of this case, have simply denuded Intervenors' RHO-related claims.

Intervenors are seeking to compel discovery relating to RHO-related subject matters on the following 3 grounds:

1. Intervenors' RHO-related counterclaims seeking damages for alleged violations of the ICO and original ICO;

2. The pending disputes as to the Cecil's RHO "residential status;" and

_____

[2] Plaintiffs intend to timely file a motion to dismiss these moot Intervenor claims.

- 7 -

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1    3.  Intervenors' contention Plaintiffs' alleged knowledge as to the Hotel's

2    alleged "residential status" under the ICO, prior to their purchase of the Hotel in

3    mid-2007, is somehow relevant to Interveners' claims.

4         Plaintiffs contend none of Intervener's above claims support, justify or permit

5    Intervenors' RHO-related discovery demands.

6                        *Intervenors' RHO Counterclaims*

7         Intervenors assert they are entitled to discovery all the way back to May 2006

8    based on Intervenors' pending claims for damages, declaratory relief and injunctive

9    relief under the City's ICO moratorium and original RHO Ordinance, but their non-

10   moot claims actually start in May of 2008 with the enactment of the original RHO

11   because:

12        (1)     The ICO (unlike the two later RHOs) contains no "private right of

13   action" for "interested persons," so Intervenors latch the required valid legal standing

14   to assert any claims under the ICO; and

15        (2)     Under Judge Pregerson's dismissal Order, it follows, *mutatis mutandis*,

16   Intervenors' claims for declaratory and injunctive relief under the original RHO have

17   also been rendered moot by reason of the expiration of those Ordinances – leaving

18   only Intervenors' damage claims under the original RHO.

19        Importantly, Intervenors' damage claims under the original RHO, while not

20   moot, are, as noted above, necessarily limited to the time period from May 20, 2008,

21   *i.e.*, from the time the original RHO became effective in May 20, 2008 until August

22   22, 2008, the date the original RHO was superseded by the current RHO.

23        Accordingly, Intervenors presently have no valid legal claim for RHO

24   damages either *before* May 20, 2008, or *after* August 22, 2008. Why? Because they

25   never amended their original RHO counterclaim to allege any violation of, or any

26   claims whatsoever, under the current RHO, which became law on August 22, 2008.

27   Indeed, Intervenors' own moving papers acknowledge in their caption that their

28   "RHO" claim is based solely on "Violation of Los Angeles City Ordinance No.

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 8 -

177557" – the initial RHO Ordinance that expired just a few weeks after Intervenors filed their present counterclaims.

### Hotel's "Residential Status"

Although, for the reasons stated above  Intervenors' original RHO <u>damage</u> claim does not justify their present RHO-related discovery, Plaintiffs freely concede Intervenors are entitled to *relevant* discovery relating to the Hotel's "residential status" under one or more of the City's Ordinances. But all 3 City Ordinances establish October 11, 2005 as the "determination date" for establishing whether the Cecil was at any time subject to the ICO or the two City RHO Ordinances. For example, the current RHO, like the prior two ordinances, defines a "residential hotel" as a hotel meeting certain physical characteristics, but also having a majority ("primarily used") of its guest rooms continuously occupied by a residential tenant, *i.e.*, for more than 30 days, and thus as a "primary residence" and not a "transient occupancy." And all 3 ordinances require residential status be established "as of October 11, 2005." [RHO §47.73(s-v), *see* **Exhibit F.**]

On February 9, 2004, the City Council, at the request of LAHD and the City Attorney, established the methodology to be used by LAHD in determining the "residential status" of City hotels under the various City ordinances. A copy of such regulations are attached hereto as **Exhibit G.** Such regulations expressly require that:

1.      Residential tenants are defined as those who occupy a given room "continuously" for "more than 30 days  (pg. 1, summary, and p. 2, top and bottom of page).

2.      "Residential status" requires the hotel <u>not</u> be "primarily used by transient guests," and so least 50% + 1 of all hotel guest rooms must be occupied by <u>residential tenants</u> – *i.e*, guests who occupy a given room "continuously" for "more

than 30 days (p.4 at middle and at bottom).[3] These regulations and requirements for "residential status are, of course, consistent with the definition of residential status under Cal. H&S Code §50519 (which is the State law on which the ICO, and both RHOs were based, the definition of a residential tenancy in Cal. Civ. Code §1940, and the definition of a transient tenancy in the State Transient Occupancy Tax ("TOT") statute, and other relevant state law.

Thus, putting aside Intervenors' RHO "damage" claims (which as noted above are limited to the *3-month period* from May 2008 to August 2008), the only other relevant time period for Intervenors' "residential status" claims and discovery under *all 3 City ICO/RHO Ordinances* is October 11, 2005. And even then, the only appropriate or relevant inquiry is as to the number of the Cecil's 598 guest rooms continuously occupied for more than 30 days by a "residential tenant" as of October 11, 2005.

Accordingly, whether a majority (300) of the Cecil's rooms were occupied by residents or transients either <u>before</u> or <u>after</u> the October 11, 2005 determination date those facts are completely immaterial to the Cecil's "residential status" under the ICO or either RHO. All that matters is how the rooms were occupied as of October 11, 2005.

Amazingly, despite this incontrovertible fact, Intervenors' motions herein seek to compel "residential status" discovery <u>only</u> for the period from <u>May 2006</u> to present" – a time period which on its face is too late and thus completely irrelevant to the Cecil's "residential status under any of the three City ordinances!

Intervenors' moving papers suggest Plaintiffs have "stonewalled" production of "residential status" documentation. That claim is completely disingenuous. The true facts are that Plaintiffs previously and *voluntarily* provided counsel for the

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

---

[3] For the Court's convenient reference, the referenced text in Ex. E has been highlighted in yellow.

- 10 -

Intervenors with almost a thousand pages of computerized Hotel occupancy records, TOT reports, TOT audits, City Office of Finance audits, formal LAHD Hotel Inspector findings, and voluminous additional documentation – all of which show the Cecil had not more than 130 residential tenants as of October 11, 2005. Indeed, such data includes a chart showing, for all 598 Cecil guest rooms, which rooms were "residential" and which were "transient" as of October 11, 2005.

Plaintiffs compiled all the documentary evidence in their possession bearing on the Hotel's "residential status" "as of October 11, 2005 in order to submit that evidence with the Administrative Appeal Plaintiffs' filed on January 5, 2011. Attached hereto as **Exhibit H** is a copy of LAHD's standard form for administrative appeals as to "residential status," which specifically requires the appellant to list and provide supporting evidence showing:

      1)    A list of the total number of units per building as of October 11, 2005

      2)    A list of the total number of residential units as of October 11, 2005

      3)    A list of the total number of units claimed non-residential as of October 11, 2005.

Although Plaintiffs are unaware of any formal or informal requirement to provide that same information to Intervenors, Plaintiffs, as a courtesy, and to eliminate any need on Intervenors' part to undertake formal discovery on the "residential status" issue, delivered a CD-Rom with copies of Plaintiffs'' entire RHO submission to counsel for Intervenors.

Plaintiffs respectfully submit that Intervenors, instead of caterwauling about Plaintiffs stonewalling such discovery, should have disclosed to this Court they have already received copies of all "residential status" documentation in Plaintiffs' have identified to date.[4]

---

[4] In Plaintiffs' LAHD Cecil Administrative Appeal, the City was required to disclose all evidence supporting its December 2009 "initial determination" re the Cecil's "residential status" as of October 11, 2005. The City produced only a single

OPPOSITION TO COUNTERCLAIMANTS' MOTIONS TO COMPEL DISCOVERY

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

Since Intervenors have not been candid about the extensive "residential status" evidence Intervenors already received from Plaintiffs, the Court should be aware of what is really going on. The huge hoard of October 11, 2005 occupancy data which Plaintiffs filed with LAHD and voluntarily provided to Intervenors included all material information: The Date each occupancy in each of the 598 rooms began and ended to show all occupants "as of October 11, 2005 and the total number of days that guest continuously occupied that room, along with price, and other pertinent data regarding the occupancy. But ... Plaintiffs' counsel <u>redacted</u> all personal private guest identification information of the transient guests, because, as is discussed more fully below,[5] such guest private personal identification information is protected against disclosure by Section 1 of the California Constitution.

Intervenors' counsel, during our "meet & confer" sessions as to the disputed discovery, advised me they would be seeking to compel Plaintiffs to <u>re-produce</u> its "residential status" documents, solely to obtain the very names and other private identification information of Cecil's transient guests, information which was which was redacted on the documents Plaintiffs already delivered to the City and Intervenors. In the words of Ms. Schultz: "We want the names, we need the names." Why? Presumably in order to locate and target (my words, not theirs) "transient" occupants for depositions, harassment, etc. The very thing the Constitutional privacy protection was intended to prevent.

Plaintiffs respectfully submit Intervenors have, in effect, admitted they have already received all Cecil records that are relevant and non-privileged bearing on the "residential status" issues; instead, Intervenors are now seeking (1) occupancy

page: An undated 2005 "rent roll" listing <u>only 125 residential tenants</u>. A copy is attached hereto as **Exhibit I**. Likewise, Intervenors, pursuant to applicable FRCP rules, made voluntary disclosures of their evidence on this issue, but provided no evidence the Cecil was a residential hotel as of October 11, 2005.

[5] The privacy privilege issues regarding Intervenors' improper effort to by-pass the state Constitution's privacy protections are discussed below, at pp. 22ff.

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

OPPOSITION TO COUNTERCLAIMANTS' MOTIONS TO COMPEL DISCOVERY

1    information <u>before</u> and <u>after</u> October 11, 2005, and (2) privileged guest occupancy

2    information as of October 11, 2005. The first category is irrelevant, and the second

3    category is privileged against disclosure.

### PMK Requests re "Residential Status"

5         Turning to Intervenors' *PMK* requests directly or indirectly relating to

6    "residential status" and Plaintiffs' alleged "discovery" of such "status" in connection

7    with their purchase of the Hotel in the May 2007, it is obvious neither of these PMK

8    requests can serve any useful or relevant discovery purpose, and thus have been

9    served principally to harass Plaintiffs and run up their legal fees.

10        The Cecil's "residential status" under the ICO or either RHO, unless and until

11   it is finally judicially determined, is not a "fact" that can be "known," it's a mixed

12   fact/law issue, and a disputed one. It's completely unlike knowledge of Hotel

13   operations, actions, policies or procedures. There is no "person" at the Hotel with

14   "knowledge" of the Hotel's "residential status." All Hotel documents Plaintiffs have

15   identified on this issue were long ago voluntarily produced to Intervenors. Thus, the

16   pending PMK notice is nothing more than a ploy to oppress Plaintiff' management

17   and unjustifiably increase the burden and expense of Plaintiff.

18        All Cecil personnel can testify to is that Plaintiffs' attorneys had personnel

19   search for, and then collate, all relevant Cecil occupancy-related documents they

20   could locate, and counsel submitted those documents to the City and to the

21   Intervenors. The City apparently has since determined, wrongfully in Plaintiffs'

22   view, these same files are insufficient to legally prove the Hotel is <u>not</u> a "residential

23   hotel." At some point a court or jury will be required to determine which side is

24   legally correct. In any event, a PMK deposition will be of no help because the simple

25   fact is that it is Plaintiffs' counsel, not Plaintiffs, who is "most knowledgeable" about

26   the RHO's legal requirements and why the Cecil contends the documents already

27   produced prove "transient status," not "residential status."

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 13 -

*Plaintiffs' Alleged Discovery of The Cecil's Alleged "Residential status"*
*During Negotiations for the Hotel Purchase in May 2007*

Something similar is true regarding Intervenors' demand that Plaintiffs designate a PMK to testify as to what "Plaintiffs" learned, if anything, about the Cecil's "residential status" during negotiations for the purchase of the Hotel in the Spring and Summer of 2007.

Intervenors' moving papers suggest that if the prospective buyers learned the City was then *claiming* the Cecil was a "residential hotel," then the buyers, when they became owners, were "estopped" from later contending the Cecil was **not** a residential hotel as defined in the RHO. Indeed, Intervenors' moving papers suggest the present Cecil owners would be subject to criminal penalties if the questions the Cecil's "residential status" after the purchase.

These contentions are of course, utter nonsense. No estoppel would legally result from such alleged "knowledge," and under the RHO only the City could assert criminal charges, and none are pending or threatened.

But even *assuming* Intervenors had some legitimate legal claim premised on the Plaintiffs becoming aware of the City's designation prior to the 2008 Hotel construction, then for certain no discovery is needed. Why? Because Plaintiffs, *in their Complaint*, freely admit they learned of the City's position regarding "residential status" in a meeting with City officials on December 20, 2007:

> [O]n December 20, 2007, Aldape and other senior LAHD officials met with representatives of the Cecil owners, who had requested the meeting because they wanted to know why the LAHD had officially determined the Cecil was not a tourist hotel. Of course, Aldape did not disclose (a) what had happened at the all-hands LAHD meeting just a month before, (b) the arbitrary and unfair nature of the LAHD January 2007 determination, (c) the October 2005 determination the Cecil was in fact a transient hotel, (d) that the January 2007 determination failed

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 14 -

1      to apply the standards used for other transient hotels to the Cecil, (e)

2      that the professional inspectors at the LAHD unanimously believed the

3      January 2007 determination was unfair and unsupported, arbitrary,

4      without any rational basis and obviously incorrect, or (f) that the

5      January 2007 determination was made to satisfy homeless advocate

6      groups who wanted to convert the Cecil from a transient hotel into a

7      hotel for the homeless.

8      Instead, Aldape told the Plaintiffs' representatives the LAHD would not

9      discuss the reasons it had determined the Hotel to be a "residential

10     hotel," or the evidence that determination was based on. He stated the

11     decision had been made, acknowledged Plaintiffs' efforts to obtain a

12     reconsideration of the decision,  but advise[d] Plaintiffs the January

13     2007 determination was final and would not be changed under any

14     circumstance. Aldape suggested Plaintiffs accept the decision, and

15     make a "deal" with the LAHD to use the Hotel for affordable housing

16     and sheltering the homeless. Aldape said that in the meantime the

17     LAHD would enforce the ICO against the Cecil and freeze any permits

18     submitted to renovate the Hotel.

19     [Amended Complaint, ¶¶ 83-84]

20     Accordingly, it is an **admitted fact** that Plaintiffs knew, before the 2008

21     construction,[6] that the City contended the Hotel had been designated as an RHO. Of

22     course, Plaintiffs disputed the City's position, and that result ended up in this

23

24     [6]  Interestingly, the City took no action to stop Plaintiffs early 2008

25     construction by issuance of a stop work order or otherwise, because the City (and the

26     CRA!) found that construction was maintenance and repair, and not a "conversion"

27     in violation the RHO.

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 15 -

lawsuit. Certainly, Plaintiffs' discovery of the City's position in December 2007 – or earlier – surely didn't mean that issue was settled; Plaintiffs had the legal right to challenge the City's position, and have done so both administratively and in this lawsuit.

Plaintiffs concede the situation might be different in the related State Action, where a Cecil investor has sued their real estate brokers for fraud, contending the brokers knew about the risk of "residential status" prior to the purchase closing in the Summer of 2007, but failed to disclose that risk to the investors. In that case, where fraudulent non-disclosure is the claim, proof by the brokers that the investors knew about the alleged risk *before* the purchase would be directly relevant to the brokers' defense of full disclosure. But there is no similar defense available to the City or the Intervenors in this action, and Intervenors have cited no case holding that pre-purchase knowledge by the Plaintiffs is a bar to Plaintiffs' 42 USC §1983 claim, and there is no such legal authority. Accordingly, any such "knowledge" is a complete non-issue regarding Intervenors' counterclaims.

There is still another reason no PMK deposition is needed regarding information as to Hotel status which Plaintiffs obtained in purchase negotiations – such information would at best be cumulative. On February 12, 2009, a full 18 months ago, Ms. Drooz took the deposition of Fred Cordova, who is a principal in Met On Main, the Managing Member of Plaintiff 640 S. Main, an LLC investor in Plaintiff 640 Main, the acting broker for the Plaintiffs in the purchase of the Cecil and the former broker for the Cecil sellers.

Obviously, Mr. Cordova is the person most knowledgeable as to what information about the Cecil was known and disseminated to the Plaintiffs during purchase negotiations. Indeed, that topic was virtually the sole focus of Ms. Drooz' full-day examination of Mr. Cordova, and there is no one involved with the Plaintiffs who is more knowledgeable than Mr. Cordova. Mr. Cordova no longer the managing agent of 640 S. Main, is now a defendant in the State Action, and will not agree to

- 16 -

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1    serve as Plaintiffs PMK on this subject. Ms. Drooz regrettably failed to disclose her

2    prior deposition of Mr. Cordova in this case, perhaps to explain why a new PMK

3    deposition would not be cumulative and oppressive to Plaintiffs.

4                    B.      Taylor/Maniscalco's Remaining Federal and State Law Claims.

5         Intervenors' counterclaims, in addition to the above-referenced "RHO" claims

6    brought by all Intervenors, also include *non-RHO* claims: Very narrow federal and

7    state statutory claims asserted solely by Taylor, and a common law nuisance claim

8    asserted by both Taylor and Maniscalco:

9                              *Taylor's Federal Housing Act and*

10                    *California Fair Employment and Housing Act Claims*

11        Intervenor Taylor, like Maniscalco a long-time Cecil resident, alleges he

12   "suffers from leukemia and diabetes," "undergoes dialysis treatment three times a

13   week at the nearby Good Samaritan Hospital," "has a catheter attached to his chest

14   [and] … must … take baths instead of showers in order to prevent the catheter from

15   becoming infected," and Plaintiffs "padlocked the communal bathroom on Taylor's

16   floor [for] approximately two weeks," and required him "to rent a new room in order

17   to have access to running water and a bathtub for a charge of $50.00 … on three

18   occasions." [Counterclaims, ¶ 1, 34, 36-37] Taylor fails to specify the precise date of

19   these events, but the context of his allegations suggests they happened in 2008 in

20   connection with Plaintiffs' alleged "construction on the 4th, 5th, and 6th floors of the

21   Cecil." [See Counterclaims, ¶¶ 36-37].

22        Based on these allegations, Taylor further alleges Plaintiffs violated the

23   Federal Fair Housing Act, 42 U.S.C. §3604(f) (Second Cause of Action), which

24   "makes it unlawful for anyone to "discriminate in the sale or rental, or to otherwise

25   make unavailable or deny, a dwelling to any buyer or renter because of a handicap of

26   that buyer or renter;" and that Plaintiffs also violated the California Fair Employment

27   and Housing Act, Cal. Govt. Code §12955(a) (Sixth Cause of Action), which

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 17 -

OPPOSITION TO COUNTERCLAIMANTS' MOTIONS TO COMPEL DISCOVERY

1    prohibits "the owner of any housing accommodation *to discriminate* against or

2    harass any person because of...disability of that person." [Emphasis added.]

3          Neither Taylor statutory claim involves any allegation of physical injury, nor

4    is any injury required under these applicable statutes; instead, both statutes only bar

5    *discrimination*. Thus, neither statutory claim alleges Taylor suffered any specific

6    personal injury whatsoever. Instead, the material allegation is that Plaintiffs violated

7    the federal statute by allegedly refusing to make a "bathing" "accommodation for

8    Taylor [¶60], which allegation is incorporated by reference into Taylor's California

9    Fair Housing claim [¶73].

10                *Taylor and Maniscalco's State Common Law Nuisance and*

11              *Intentional and Negligent Infliction of Emotional Distress Claims*

12         Taylor and Maniscalco indiscriminately incorporate <u>all</u> allegations of the

13    counterclaims into their common law "nuisance" claim (Fifth Cause of Action), and

14    then add boilerplate state claims for both intentional and negligent infliction of

15    emotional distress based on their nuisance claim. (Seventh & Eighth Causes of

16    Action).

17         Most of the allegations reincorporated into the Taylor/Maniscalco nuisance

18    claim – *e.g.*, the ICO/RHO and both statutory claims – have nothing whatever to do

19    with the tort of nuisance. And, if one sifts through the ridiculously brief nuisance

20    allegations, there are precious few factual allegations to flesh out that claim.

21    However, the following four allegations, two of which are more legal conclusions

22    than factual allegations, seems to make it clear they are complaining about some

23    construction Plaintiffs' completed on three Hotel floors (out of 13) in early 2008:

24         • ¶39 – "*In or about the beginning 2008, Counterdefendants have undertaken*

25    *heavy construction on the 4th, 5th, and 6th floors of the Cecil*. They have done

26    nothing virtually to protect residents from the noise, dust, and pollution caused by

27    the construction. At times, Taylor has been unable to sleep at night because of

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

OPPOSITION TO COUNTERCLAIMANTS' MOTIONS TO COMPEL DISCOVERY

banging and drilling. Counterclaimant [Taylor] has had difficulty breathing because of layers of plaster dust in the hallways from the construction." [Emphasis added.]

• ¶45 – "*Beginning in about January 2008, the Cecil began construction work on the floors above the 2nd floor of the hotel.* During the construction, Maniscalco was subject to deafening noise from drilling and hammering at all hours. Heavy layers of plaster dust filled the hallways and in the common areas. The dust has been so thick that he has had difficulty breathing." [Emphasis added.]

• ¶69 – "California Civil Code section 3479 states that '[a]nything which is injurious to health...or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property ... is a nuisance.' Section 3493 of the California Civil Code further provides that a private person may maintain a cause of action for public nuisance if it is 'especially injurious to himself.'"

• ¶70 – "The Counterdefendants' actions in subjecting residential tenants to the actions described herein *were injurious to the health and safety of Taylor and Maniscalco,* interfered substantially with their comfortable enjoyment of the premises, and injurious to the public at large. Therefore, the actions of the Counterdefendants constitute nuisance under California Civil Code section 3479." [Emphasis added.]

Thus, while Intervenors' counsel hyperventilates that these "nuisance" allegations permit Intervenors to compel Plaintiffs to produce virtually all Hotel records relating to the operation, condition and maintenance of the Cecil from the date Plaintiffs acquired the Hotel in the Summer of 2007 until today, the only factual nuisance allegations in the nuisance claim is that Taylor and Maniscalco had some trouble breathing and sleeping due to dust and noise generated during construction work of an unspecified duration, but occurring in early 2008 on 3 Hotel floors 4, 5 and 6.

Further, Intervenors are not just seeking <u>construction</u> records – Intervenors demand Plaintiffs produce virtually all Hotel maintenance records and all records

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 19 -

relating to the Hotel's "condition," and pertaining to speculative and unasserted "habitability" issues as to all 598 Cecil guest rooms, on all 13 Hotel floors, from the date Plaintiffs acquired the Hotel until today. The over-reach and resulting unfair burden and cost to Plaintiffs is startling.

Since both individual Intervenors have been long-term tenants of the Cecil, if any basis existed for alleging they or any other particular tenants were subjected to serious maintenance issues, defective building conditions, or serious habitability issues while they were residing at the Hotel, then Taylor and Maniscalco presumably would have so alleged in the Counterclaim. But they did not. No specific "habitability" or "maintenance" or "conditions" issues/claims are alleged in the current pleading, other than the dust and noise that allegedly affected Taylor and Maniscalco in early 2008 somewhere between the 4th and 6th floors.

Although the sole "nuisance" identified is noise and dust from construction on 3 floors in 2008, Intervenors seek "habitability" records so broad they include such ridiculous minutia as replacement of light bulbs, and windows and screens, and regular maintenance and repair of power and water systems, and even imagined but unasserted vermin and pest infestations, and for every room in the Hotel since 2007 and extending to today – three full years after the alleged construction problem.

Intervenors, perhaps realizing their one paragraph nuisance claim is too weak a reed to support Intervenors' omnibus, blunderbuss, document demands, they argue their ludicrous document demands should be granted "because Counterclaimants have alleged continuing torts [and it] … is well- settled that nuisance is a continuing tort, and that damage continue[s] to accrue until the nuisance is abated," citing Baker v. Burbank-Glendale-Pasadena Airport Authority (1985) 39 Cal. 3d·862, 868-9 , and Nestle v. Santa Monica, 6 Cal. 3d 920 (Cal. 1972).

Frankly, Plaintiffs' counsel has no idea what Intervenors are talking about, or how the cited cases are relevant, or why Intervenors believe it makes any difference in this case whether the alleged nuisance is deemed "permanent" or "continuing."

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 20 -

Plaintiffs suggest the cited cases are a complete "red herring." Both cases are "mass tort" cases involving many homeowner groups who sued municipal airports in Burbank and Santa Monica for a massive public nuisance and inverse condemnation case based on loud noises generated by numerous airplanes flying over their houses while going to and from the local airports.

In <u>Baker</u>, the trial court found the homeowners' nuisance claims were barred by the he 3-year statute of limitations because the court considered the big noisy airport to be a "permanent nuisance," which meant the nuisance statute of limitations began running the moment the airport opened – like what happens when a permanent structure is built on someone's property. That finding was outcome determinative because the homeowners had waited years to sue. Fortunately for the homeowners, the Supreme Court reversed, ruling airport noise should be treated as a normal "continuing nuisance" with a rolling 3-year limitations period, and not be treated like a physical building encroachment.

So what? These authorities have nothing to do with the instant case. Intervenors nowhere allege the noise and dust complained of "continued" after Plaintiffs' early 2008 construction was completed on floors 4, 5 and 6. Likewise, Plaintiffs don't claim any statute of limitations has run – the action was apparently filed only weeks after the construction had been completed!

Indeed, Counsel's citation of these cases shows Intervenors completely missed the important point: The nuisance alleged in the Counterclaims is likely a "continuing" one for purposes of calculating when the limitations period began to run. But that doesn't affect or extend the scope of reasonable discovery. The <u>reason</u> Counterclaimants cannot properly seek "continuing" discovery – *i.e.,* discovery before or after the alleged 2008 construction nuisance – is because neither Taylor nor Maniscalco have anywhere in their counterclaims alleged any other nuisance existed <u>before</u>, or continued <u>after</u>, the early 2008 construction.

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

The aspects of California nuisance law that are relevant to the pending motions are:

• All nuisances are deemed "private" nuisances unless the plaintiff specifically alleges the general public or "entire community" was materially affected by the alleged nuisance. 13 Witkin, Summary, Equity, Nuisances §133 at 454; §135 at 456, (11th Ed. 2005). No such allegations are present here.

• To obtain judicial relief, each claimant must allege and prove he/she "was harmed" by the alleged nuisance. California Civil Jury Instructions (CACI) #201. There is no allegation that any tenant other than Taylor/Maniscalco suffered any injury whatsoever for any reason whatsoever.

Intervenors alleged the only "nuisance" was the alleged noise and dust from Plaintiffs early 2008 construction that it uniquely affected them. Further Intervenors did not allege early 2008 construction injured anyone else, nor that there was any other nuisance other than the early 2008 construction nuisance. Thus, the pending nuisance claim is a simple noise/dust private nuisance claim solely on behalf of Taylor and Maniscalco. Accordingly, that claim, limited as to place, time and persons, cannot justify Intervenors' reckless efforts to compel Plaintiffs to produce virtually *all* Hotel maintenance, condition and habitability records, including *all* "communications regarding such matters, for *all* rooms since 2007, or as to the *exterior, roof, basement, lobby, public areas* of the Hotel, or as to any other alleged "event" other than the construction activities on floors 3-6 in early 2008.

### III.   Private Personal Information of Hotels Guests, Which Intervenors Seek Under Several of Their Discovery Requests, is Privileged From Discovery Pursuant to the California Constitution, Section 1.

As noted above in the Preliminary Statement, Intervenors' RFPs and PMK notices include demands for all Hotel records relating to hotel "status," "condition," "maintenance," "operations," "construction" and "habitability." These requests, if permitted will involve all records since 2005 for all 598 rooms in the Hotel, all

- 22 -

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

1    common areas, roof, basement, etc. To the extent all records pertaining to

2    occupancy, guest rooms, guest complaints and similar records are required to be

3    produced, such records will include personal identification information of Hotel

4    guests, such information is clearly privileged from disclosure and production due to

5    the privacy protections established in Section 1 of the California Constitution.

6        Although such privilege is not "absolute," Intervenors have failed and indeed

7    refused to make the showings applicable California law requires in order to

8    overcome that privilege. LAHD's peremptory and imperious demand that the Hotel

9    disclose several years private, confidential "identity" information for all guests,

10   residential and transient, of the Hotel over a period of several years is breathtaking in

11   its contempt for the Constitutional rights of Hotel guests.

12       Article 1, Section 1 of the California Constitution has been described as a

13   declaration of rights, stating the fundamental rights of all California citizens,

14   including the right to "obtain... privacy."  Further, although Cecil guests are third

15   parties to this lawsuit, it is well-settled that a party to an action may assert the

16   privacy rights of third parties. Valley Bank of Nevada v. Superior Court (1975) 15

17   Cal3d 652, 657; Tien v. Superior Court (2006) 139 CA4 528 n.7, 43 CR3d 121.

18       The "privacy" guaranteed by the California Constitution includes protection of

19   personal private identity information such as names, addresses and telephone

20   numbers. For example, in County of Los Angeles v. Los Angeles County Employee

21   Relations Com. (2011) 192 CA4 1409, 1419, public union members were refused

22   production from the City of names, addresses and telephone numbers of non-union

23   members. The court reasoned  "[t]here is a legally protected privacy interest in one's

24   home, which "is accorded special consideration in our [federal] Constitution, laws,

25   and traditions." (quoting from Department of Defense v. FLRA (1994) 510 U.S. 487,

26   501) and ruling "[t]he disclosure of names, addresses, and telephone numbers of

27   association members implicates the privacy interest in the sanctity of the home."

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 23 -

The right to privacy is conditional and may be overcome under certain limited circumstances when "there is a compelling opposing state interest." Ombudsman Services of Northern California v. Superior Court (2007) 154 CA4 1233, at 1249. However, when "disclosure intrudes on constitutionally protected areas, it cannot be justified solely on the ground that it may lead to relevant information," Garstang v. Superior Court (1995) 39 CA4 526, 532, and "mere speculation as to the possibility that some portion of the records might be relevant to some substantive issue does not suffice." Davis v. Superior Court (1992) 7 CA4th 1008, 1017.

Rather, the party seeking discovery "has the burden of making a threshold showing that the evidence sought is 'directly relevant' to [a specific] … claim or defense," Ombudsman Services, supra, 154 Cal. App. 4th at 1251, and the "burden is on the party seeking the constitutionally protected information to establish *direct relevance*." Davis, supra, 7 CA4 at 1017 The legal burden Intervenors bear to compel disclosure of guest names, addresses and telephone numbers are discussed in Ombudsman Services, supra, in which the Court took the very unusual step of issuing an extraordinary writ of mandate to reverse a trial court discovery order requiring production of personal information of residents living in a long-term care center to be disclosed to a litigant who was suing the center:

> We turn to the question of whether the records [the residents' names, addresses, etc.] could nevertheless be compelled for the purpose of plaintiff's litigation here. We start with the premise "that inquiry into one's private affairs will not be constitutionally justified simply because inadmissible, and irrelevant, matter sought to be discovered might lead to other, and relevant, evidence. When "compelled disclosure intrudes on constitutionally protected areas, it cannot be justified … on the ground … it may lead to relevant information." [citing Garstang] And even when discovery of private information is found *directly relevant to the issues of ongoing litigation*, it will not be automatically allowed; there must then

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

- 24 -

be a "careful balancing" of the "compelling public need" for discovery
against the "fundamental right of privacy."

Ombudsman Services, supra, at 1251.

And *even then*, the Court held the balance required by the Constitutional right to privacy still favors the privacy interest "unless the litigant can show a compelling need for the particular documents and that the information cannot reasonably be obtained through depositions or from nonconfidential sources." Id.

The Intervenors, because they seek discovery of personal private identification information of Hotel guests, information protected by the constitutional right to privacy, before enforcing that discovery request, had "the burden of making a threshold showing that the evidence sought is "directly relevant" to the claim or defense," and because such a "balance will favor privacy for confidential information in third party . . . files," the Intervenors must also "show a compelling need for the particular documents and that the information cannot reasonably be obtained through depositions or from nonconfidential sources."

Obviously, Intervenors have not made any of these required showings – an in fact have expressly refused to make such showing despite my many demands during the "meet and confer" process.

One final point on the "privacy" issue, with respect to Hotel occupancy records relating to "residential status" as of the RHO "determination date" which is "October 11, 2005," the LAHD and the City Attorney's office have both stated, in writing, that, under applicable privacy rules, all occupancy records relating to "residential status" shall be redacted to remove person identification information when submitted to LAHD.

That admission is set forth in an August 19, 2009 letter from LAHD's then Interim General Manager, which letter was prepared with input from Judy Reel, a

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

OPPOSITION TO COUNTERCLAIMANTS' MOTIONS TO COMPEL DISCOVERY

1   Deputy City Attorney, the LAHD General Manager. A copy of that letter is attached

2   hereto as **Exhibit J.**

3          The letter was issued by LAHD in response to building owner complaints the

4   LAHD was making status decisions based solely on hotel records as of the date

5   specified in the RHO (October 11, 2005) and this was unfair because, by August

6   2009, many owners lacked records going back that far. When this point was made at

7   the meeting memorialized in the August 19, 2009 letter: "The City Attorney

8   responded [LAHD] … does not have the authority to modify the requirements of the

9   Ordinance [*i.e.,* the submission of records evidencing occupancy as of the October

10  11, 2005 determination date]."

11         This same August 19, 2009 letter also responded to owners' concerns LAHD

12  was requiring the submission of occupancy data containing of confidential privacy

13  information – names, addresses, etc., of guests. The acting General Manager stated

14  LAHD "had worked with the City Attorney's Office to address [that] … concern,

15  resulting in owners being permitted to enter their information on a spreadsheet

16  excluding the confidential elements of their information." (Emphasis added.)

17         Thus, the LAHD and City Attorney's Office have agreed to two points relied

18  on by Plaintiffs in this discovery dispute:

19         1.     Only Hotel occupancy data "as of October 11, 2005" is relevant to

20  "residential status" under the ICO, and two RHOs; and

21         2.     Applicable California privacy privilege rulings require that guest

22  personal identification data be treated as privileged from production in the context of

23  "residential status" determinations.

24         Obviously, given the position of the City and City Attorney's Office that hotel

25  guest personal identification data is privileged from production as to "residential

26  status" determinations, why legal basis do Intervenors have for ignoring that

27  privilege. Also, this same privilege issue clearly arises in the context of Intervenors'

28

AUGUSTINI LAW OFFICES
ATTORNEYS AT LAW

OPPOSITION TO COUNTERCLAIMANTS' MOTIONS TO COMPEL DISCOVERY

several other omnibus document demands re the Hotel's "construction," "condition," "habitability," etc.

Respectfully submitted,

Dated: July 6, 2011

**AUGUSTINI LAW OFFICES AND**

**GORDEE, NOWICKI & AUGUSTINI, LLP**

By: _____
ALFRED E. AUGUSTINI
AUGUSTINI LAW OFFICES
ATTORNEYS FOR PLAINTIFFS

OPPOSITION TO COUNTERCLAIMANTS' MOTIONS TO COMPEL DISCOVERY